2007-NMSC-037

164 P.3d 19

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Stephanie LOPEZ, Defendant–Respondent.**

No. 29,803.

Supreme Court of New Mexico.

June 21, 2007.

Gary King, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Liane E. Kerr, Liane E. Kerr, L.L.C., Albuquerque, NM, for Respondent.

## OPINION

MAES, Justice.

{1} Defendant Stephanie Lopez was convicted by a jury of negligently permitting child abuse resulting in death or great bodily harm, and negligently permitting child abuse not resulting in death or great bodily harm, contrary to NMSA 1978, Section 30–6–1 (2001). Defendant was tried with four codefendants facing various charges as a result of the death of Defendant's five-month-old daughter, Baby Briana. Prior to trial, Defendant made a motion to sever her trial from that of her codefendants. She asserted that her right to confrontation would be violated in a joint trial if the custodial statements of her codefendants were admitted as evidence. Defendant's motion was denied. At Defendant's trial, the district court admitted into evidence the statements made by her codefendants while they were in custody. On appeal, the Court of Appeals held that the admission of the codefendants' statements resulted in a violation of Defendant's Sixth Amendment right to confrontation and that this constitutional error was not harmless. The Court of Appeals reversed Defendant's conviction and remanded her case with the instruction that Defendant be tried separately. The State petitioned this Court to review the Court of Appeals' Opinion. We granted certiorari on the State's petition and reverse the Court of Appeals' Opinion as it applies to Defendant, Stephanie Lopez.

## FACTS AND PROCEDURE BELOW

{2} Baby Briana died on July 19, 2002. At the time, Defendant lived with Baby Briana's father, Andrew Walters (Father), in the mobile home of Father's mother, Patricia Walters (Grandmother). Defendant and Father shared one bedroom of the mobile home with Baby Briana, the couple's eighteen-month-old son, Andy Jr., and Defendant's twin brother, Steven Lopez (Uncle).

{3} On the morning of July 19, 2002, Defendant made a 911 call to report that Baby Briana had stopped breathing. Defendant and Father administered C.P.R. on Baby Briana until paramedics arrived and transported her to the hospital. When Baby Briana arrived in the emergency room she had bruises and bite marks on her body and head, and she appeared lifeless. After unsuccessful attempts to resuscitate her, Baby Briana was pronounced dead.

{4} Defendant's statement to the attending physician and nurse in the emergency room indicated that Baby Briana's injuries were the result of Baby Briana falling out of bed. However, the forensic pathologist who testified at Defendant's trial stated that Baby Briana's injuries were not the result of Baby Briana falling out of bed. The autopsy of Baby Briana revealed that she died from cranial cerebral injuries. She had bruising and scraping injuries throughout her head, as well as on her upper forehead. She had numerous human bite marks all over her body and head, fifteen in total. There were extensive injuries to Baby Briana's head and fatal injuries to her brain. She had bleeding within the membranes around the brain as well as around the nerves of her eyes. The autopsy revealed that Baby Briana's skull was fractured in two places, on two different bones, and that the fractures were 5–7 days old. An examination of the membranes around the brain showed the presence of both old and new blood, indicating that Baby Briana had received a separate brain injury in the past. Baby Briana's optical nerves were filled with both fresh and old blood which meant that she had been violently shaken on at least two occasions. Baby Briana suffered two rib fractures on the right side of her chest several weeks before her death. She also had bucket handle fractures on both her right and left thigh bones as well as a fracture through the top of her left arm. These injuries were the result of her limbs being forced, twisted, or yanked. Baby Briana's anus and vagina were also injured.

Baby Briana's death was characterized as a homicide.

## Statements of Defendant and her Codefendants

{5} In the course of the investigation of Baby Briana's death, police interviewed Defendant, Father, Uncle, and Father's Brother, Robert Walters. Defendant was interviewed on July 19, 2002. In her statement to police, Defendant said that a couple of days prior to Baby Briana's death, Defendant had observed Father throwing Baby Briana up in the air and saw her "come down." Defendant said that she told Father not to do that because he was going to hurt the child. Defendant attributed the bruising on Baby Briana's head to the fact that Baby Briana rolled off the bed a few days prior to July 19, 2002. Defendant stated that on the night of July 18, 2002, she was in her bedroom of the mobile home with Father, Uncle, Andy Jr., and Father's brother Robert Walters. Defendant said that she had two to three beers prior to falling asleep at approximately 10:00 p.m. Father and the two uncles remained awake. When Defendant woke up at 9:45 a.m., Baby Briana was bruised, pale, and not breathing. Defendant said that she and Father were worried about Baby Briana's condition so they called Grandmother and then called 911. The 911 call was made at 10:20 a.m. Defendant stated that the bruising and other markings on Baby Briana's body were not there when she went to bed the night before. Defendant's explanation as to the bruising documented by medical personnel was that Father had said maybe Uncle threw Baby Briana up in the air. Defendant stated that she had seen Father throw Baby Briana up into the air but she said she had not seen it occur on the night of July 18, 2002. Defendant stated that she had seen Father throw Baby Briana into the air and saw her head hit the ceiling in the bedroom approximately three times. Defendant also said that maybe Uncle threw Baby Briana up into the air as well. In explaining the bite marks, Defendant said that she had seen her son bite Baby Briana.

{6} Father was also interviewed by police on July 19, 2002. In his statement to police,

Father admitted to throwing Baby Briana in the air. He stated that he had done it four days prior to her death and that on the night of July 18, 2002, he said that he threw her up into the air two or three times and that her head hit the ceiling. Father also stated that Uncle threw Baby Briana in the air.

{7} During the police interview, Father recounted his activities from the night of July 18, 2002. He said he got off work at 5:00 p.m. and arrived home around 6:00 p.m. Sometime around 8:00 p.m., he picked up Uncle at work and they purchased a case of beer. They returned to their house and spent the rest of the night in their room with Mother, Baby Briana, and Andy Jr. He said he went to sleep between 12:30 and 1:00 a.m. and checked Baby Briana around 3:00 a.m. He then got up around 7:00 a.m., played with Baby Briana, and gave her a blanket, and changed her diaper. Father said he awoke again at around 10:00 a.m. and he and Defendant discovered Baby Briana was not breathing so they called 911. In this portion of the interview, Father admitted only that Baby Briana had fallen off her bed during the night and that he caused two bite marks on her ribs, after initially claiming that his 18-month-old son made the bite marks.

{8} After a break, the police continued interrogating Father and informed him that Baby Briana was dead. Father then admitted to throwing Baby Briana into the air and said that Baby Briana hit her head on the ceiling four days before she died. Father admitted to bruising Baby Briana, stating, "I didn't mean for it to leave a bruise like that. Like I left her a bruise like that before, just from messing with her. [Mother] gets mad." Father admitted that on the night of July 18, 2002, he and Uncle were "playing a little rough" with Baby Briana and throwing her into the air, with Baby Briana hitting the ceiling, and being dropped onto the floor when he "missed" her. Father identified a particular bruise on a photo as being caused when Baby Briana hit the ceiling and another when she landed on the floor. Father also identified various bite marks that he acknowledged he made. Father said Baby Briana cried when she was dropped onto the floor, and when he was asked what he did to

calm her down, he answered, "I just kept throwing her in the air."

{9} Father was also shown a photo of Baby Briana's anus, and Father became very upset and profane, saying to police that they were "not going to find any semen." Father said he cleaned Baby Briana's butt with a baby wipe, wrapped the baby wipe around his left index finger, and put the wrapped finger into Baby Briana's anus up to the second knuckle at the middle of his finger. When he took his finger out, "[t]here was a little bit of blood on there."

{10} Father stated that Mother would sometimes get mad at Baby Briana and would pinch Baby Briana's ears and throw Baby Briana into her bouncy seat from a distance of about two feet. Father also stated that Mother questioned him about the bruises on Baby Briana and he informed her that he had been playing rough with her.

{11} Uncle was also interviewed at the police station on July 19, 2002. Uncle gave an initial statement to police after being informed of his *Miranda* rights. Uncle stated that on the night of July 18, 2002, he was in the bedroom playing video games with Father and Mother. He said that Robert Walters came home with a friend and they stayed in the room together drinking beer. Uncle said that Defendant had four or five beers. Uncle stated that nothing unusual happened that night and he went to bed at 2:00 a.m. In a subsequent statement to police, Uncle admitted to throwing Baby Briana in the air and said that one time she hit her head on the ceiling. Police then confronted Uncle with admissions made by Father regarding the events of July 18, 2002. Uncle stated that Father was throwing Baby Briana up into the air and that she hit her head twice. After further questioning, Uncle admitted that he also threw Baby Briana into the air so that she would hit her head on the ceiling and allowed her to fall onto the floor. Uncle was then shown photographs of Baby Briana's anus. Initially Uncle denied touching Baby Briana's anus, saying, "Oh, no. I didn't do that. I didn't do nothing like that." When questioned further, his response changed to, "I can't remember. I don't remember." Uncle then proceeded to talk about the number of beers he had consumed and he then said he could not remember starting a sex act with Baby Briana, but he remembered stopping because he realized what he was doing was wrong.

**Defendant's Trial**

{12} As a result of these events, Defendant was charged with negligently permitting child abuse resulting in death or great bodily harm, negligently permitting child abuse not resulting in death or great bodily harm, and intentional child abuse not resulting in great bodily harm, contrary to Section 30-6-1. Father, Uncle, Grandmother, and Robert Walters also faced various charges as a result of Baby Briana's death. The State filed a Statement of Joinder, requesting that Defendant be tried together with Father, Uncle, Grandmother, and Robert Walters. In response, Defendant filed a motion to sever her trial from that of her codefendants. In support of her motion, Defendant argued that a joint trial would result in unfair and incurable prejudice because the statements her codefendants gave to law enforcement would be inadmissible against Defendant in a separate trial. The trial court denied Defendant's motion and proceeded with the joint trial of the five codefendants. The custodial statements of Defendant, Father, Uncle, and Robert Walters were admitted at the joint trial, over Defendant's objection that the admission of her codefendants' testimony would violate her right to confrontation.

{13} Defendant was convicted of negligently permitting child abuse resulting in death or great bodily harm, negligently permitting child abuse not resulting in death or great bodily harm, and acquitted of intentional child abuse not resulting in great bodily harm. Defendant, Father, and Uncle appealed their convictions to the Court of Appeals. Grandmother and Robert Walters did not appeal. The Court consolidated the appeals of Defendant, Father, and Uncle and reversed the convictions of each of the defendants and remanded their cases with instructions that the defendants be tried separately. The Court held that the admission of the statements of the codefendants violated the defendants' Sixth Amendment right to con-

frontation and that this constitutional error was not harmless beyond a reasonable doubt. *State v. Walters*, 2006–NMCA–071, ¶ 1, 139 N.M. 705, 137 P.3d 645. The State appealed to this Court arguing that the Court of Appeals erred in determining that (1) Defendant preserved her argument at trial, (2) her confrontation rights were violated, (3) this error was not harmless, and (4) Defendant is entitled to a separate trial.

## DISCUSSION

### Preservation

■ {14} We first address the State's claim that Defendant failed to preserve her claim for severance. The State argues that Defendant failed to properly preserve the issue of whether her right to confrontation was violated when she was denied a separate trial and the statements of her codefendants were admitted at her joint trial. The State asserts that Defendant did not preserve this argument for appeal because she failed to identify with specificity the portions of the statements that were the subject of her objection.

{15} In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon. Rule 12–216 NMRA; *State v. Varela*, 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280. In the present case, Defendant made numerous objections, both prior to trial and during her joint trial. Defendant filed a Motion in Limine to sever her trial from that of her codefendants, arguing that she would be prejudiced if the court admitted the statements of Father and Uncle. The trial court denied Defendant's motion. Defendant renewed her motion to sever after opening statements were made. The court again denied Defendant's motion, stating:

> Counsel, all of you have made a renewed motion on the record. I don't know that you need to do it over and over again, but you certainly all have a motion for severance. I ruled on it and I intend that be preserved for all of you. I certainly want you to be able to appeal any matter that you feel you should appeal.

After her renewed motion to sever was denied, Defendant requested that, as an alternative to severance, the court redact the accusatory portions of Father's statement that refer to Defendant. This request was also denied by the court. Throughout trial, Defendant's codefendants raised objections based on "hearsay, [the] fifth amendment, and *Bruton*" to the testimony of the police officers who introduced the statements of Father, Uncle, and Defendant. Defendant joined in these objections.

{16} We find that Defendant's motion to sever and her objections at trial properly preserved her argument that the inclusion of her codefendants' statements resulted in a violation of her Sixth Amendment right to confront witnesses against her. By including the terms, "*Bruton*" and "Confrontation Clause" in her objections, Defendant effectively put the court on notice of the specific nature of her objection and the impropriety of allowing a joint trial where the statements of codefendants would be offered as evidence.

### Severance

■ {17} At trial and on appeal, Defendant's severance arguments were based on her assertion that the custodial statements made by Father and Uncle would not have been admissible against her in a separate trial. Severance may be necessary if evidence that is inadmissible at defendant's separate trial is admitted in a joint trial. *See State v. Montoya*, 114 N.M. 221, 225, 836 P.2d 667, 671 (Ct.App.1992). The conclusion that inadmissible evidence was introduced at a joint trial does not necessitate reversal of a denial of severance in all cases. "A trial court has discretion in deciding whether or not to sever a case. On review of such a decision we must decide whether, due to the joint trial, there is an appreciable risk that the jury convicted for illegitimate reasons." *Id.* at 224, 836 P.2d at 671 (citation omitted). Therefore, we begin our inquiry by examining the statements of Father and Uncle to determine if they were erroneously admitted. Then we examine the impact of those statements.

**Statements**

■ {18} Whether the admission of a codefendant's custodial statements constitutes a violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution presents a question of law which we review de novo. *See Lilly v. Virginia*, 527 U.S. 116, 136–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *State v. Dedman*, 2004–NMSC–037, ¶ 23, 136 N.M. 561, 102 P.3d 628.

■ {19} The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *accord State v. Alvarez–Lopez*, 2004–NMSC–030, ¶ 21, 136 N.M. 309, 98 P.3d 699 (quoting *Crawford* ). While declining to offer a "comprehensive definition of testimonial," the *Crawford* Court stated that at a minimum, the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354; *accord State v. Johnson*, 2004–NMSC–029, ¶ 2, 136 N.M. 348, 98 P.3d 998 (quoting *Crawford* ).

{20} The State argues that the custodial statements of Father and Uncle fall outside of *Crawford* and do not implicate Defendant's right to confrontation. The State is correct in the assertion that not all police interrogations produce testimony. Since *Crawford*, the Supreme Court has clarified that police interrogations produce testimony when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, ——, 126 S.Ct. 2266, 2269, 165 L.Ed.2d 224 (2006). In this case, the statements of Father and Uncle were elicited during a police interrogation that took place at the police station, hours after Baby Briana's death. Through their interrogation, police attempted to reconstruct the events that led to Baby Briana's death and obtain inculpatory statements from the codefendants. Because the questioning of the codefendants constituted an attempt to "prove past events potentially relevant to later criminal prosecution," *id.*, we conclude that the statements of Father and Uncle are testimonial.

■ {21} The testimonial statements of Father and Uncle were admitted at trial through the testimony of the interrogating officers. Father and Uncle did not testify at Defendant's joint trial and it is undisputed that Defendant did not have a prior opportunity to cross-examine Father or Uncle. Thus, the admission of these statements was clearly contrary to the Supreme Court's holding in *Crawford*. Therefore, the admission of Father's and Uncle's statements in this case is a "per se" violation of Defendant's Sixth Amendment right to confront the witnesses against her. *See Johnson*, 2004–NMSC–029, ¶ 7, 136 N.M. 348, 98 P.3d 998 ("[U]nder *Crawford*, because Defendant did not have an opportunity to cross-examine [the witness], the admission of [his] statement constituted a per se violation of Defendant's Sixth Amendment right of confrontation.").

**Harmless Error**

■ {22} Having decided that the admission of Father's and Uncle's statements constituted a violation of the Confrontation Clause, we must now determine whether this violation of Defendant's constitutional rights warrants reversal of her conviction. The State asserts that the Court of Appeals' reversal of Defendant's conviction was erroneous because any error regarding the admission of Father's and Uncle's statements was harmless. A violation of a defendant's constitutional right to confrontation may be deemed harmless if the State can establish that the constitutional error was " 'harmless beyond a reasonable doubt.' " *Alvarez–Lopez*, 2004–NMSC–030, ¶ 25, 136 N.M. 309, 98 P.3d 699 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). In the case of constitutional error, the error may be deemed harmless if there is no " 'reasonable possibility that the

evidence complained of might have contributed to [the defendant's] conviction.'" *Johnson*, 2004–NMSC–029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (quoting *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

{23} We stated in *Johnson* that the reviewing court must examine several factors to determine whether a constitutional error may be considered harmless:

These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* ¶ 11 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). "We emphasize[d] that constitutional error must not be deemed harmless solely based on overwhelming evidence of the defendant's guilt; the overall strength of the prosecution's case is but one factor in our harmless-error analysis." *Id.*

{24} In light of the above principles, we turn to the record in this case to determine whether the erroneous admission of codefendant's testimony was harmless beyond a reasonable doubt with respect to each of Defendant's convictions. *See id.* ¶ 31. "Because our harmless-error analysis instructs that error may be prejudicial with respect to one conviction, but harmless with respect to another, we review the effect of [codefendant's] statement with respect to each conviction separately." *Id.* (quoting *Clark v. State*, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991)).

**I. Negligently Permitting Child Abuse Resulting in Death or Great Bodily Harm**

{25} The charge of negligently permitting child abuse resulting in death or great bodily harm pertains to the injuries inflicted on Baby Briana in the last two days of her life. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be ... placed in a situation that may endanger the child's life or health [or] tortured, cruelly confined or cruelly punished," resulting in the death of, or great bodily harm to, the child. Section 30–6–1(D); *see also* § 30–6–1(E)–(F). Under this theory, the State was required to prove in relevant part that: (1) Defendant permitted Baby Briana to be placed in a situation which endangered the life or health of Baby Briana or permitted Baby Briana to be tortured or cruelly punished; (2) Defendant acted intentionally or with reckless disregard; (3) Defendant was a parent, guardian or custodian of the child, or had accepted responsibility for the child's welfare; (4) Defendant's actions or failure to act resulted in the death of or great bodily harm to Baby Briana; and (5) this happened in New Mexico on or between July 18, 2002, and July 19, 2002. *See* UJI 14–603 NMRA (defining the elements of negligently permitting child abuse with bodily harm).

{26} A review of Father's and Uncle's statements reveals that they are largely silent with regard to Defendant's actions or knowledge during the last two days of Baby Briana's life. Father and Uncle both stated that Defendant was in the room on the night of July 18, 2002, and Uncle stated that Defendant consumed five to six beers that night. In Defendant's statement to police she did not contradict Father's or Uncle's statements in any significant respect. Defendant told police that she was in the room with Father, Uncle, and Baby Briana, and that she fell asleep around 10:00 p.m. after drinking two to three beers. The statements given by Father and Uncle referred almost exclusively to their own conduct of throwing Baby Briana in the air and allowing her to fall to the floor and to sexually assaulting Baby Briana. In his interview with police, Father explicitly stated that Defendant was "passed out" while Baby Briana was being thrown in the air:

Q. When [Baby Briana] hit her head on the ceiling? Did she cry?

A. Yeah.

Q. What did Stephanie say?

A. I don't even know, I don't even know if she was awake or no.

Q. Did she pass out?

A. She just passed out.

Later in his interview with police, Father was questioned about Defendant's whereabouts on the night of July 18, 2002:

Q. And where's your wife this whole time?

A. She was there too.

Q. Did she see it happen?

A. She passed out.

Q. She saw some of it happen because she told part of it, correct?

A. She was passed out.

Q. She was passed out? So the only ones awake were you, Briana and Steven? Yes or no?

A. Yes, sir.

Father and Uncle did not indicate in any way that Defendant participated in the abuse of Baby Briana in any way.

{27} Considering the first of the *Johnson* harmless-error factors, the importance of the witness' testimony, Father's and Uncle's testimonial statements were not significantly damaging to Defendant. Father and Uncle merely placed Defendant in the room with Baby Briana on the night of her death, a fact Defendant admitted in her own statement to police. As to the second *Johnson* factor, the statements were essentially cumulative to Defendant's own admissible testimony. *See Johnson*, 2004-NMSC-029, ¶ 38, 136 N.M. 348, 98 P.3d 998 (describing that "[c]umulative evidence is additional evidence of the same kind tending to prove the same points as other evidence already given"). The only distinction between Defendant's version of events, and Father's and Uncle's description of Defendant's behavior, was the number of beers Defendant consumed. Defendant claimed she consumed two or three beers, while Uncle told police she drank five or six. As to the third factor articulated in *Johnson*, "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," Defendant's own statement to police corroborated the statements of Father and Uncle. Regarding the fourth factor listed in *Johnson*, the extent of Defendant's opportunity to cross-examine Father or Uncle, Defendant did not have an occasion to cross-examine her codefendants, as neither testified at the joint trial.

{28} Finally, as to the overall strength of the prosecution's case, a jury would have found support for each of the elements of negligently permitting child abuse merely by examining the physical evidence in this case. The physical evidence admitted at trial established that Baby Briana suffered from three limb fractures, the subdural hematoma that killed her, fresh retinal bleeding, and dozens of bruises and bite marks all over her body. This evidence, coupled with Defendant's own statement placing her in the room with Baby Briana on the night the abuse occurred, provides overwhelming proof that Defendant negligently permitted child abuse, resulting in the death or great bodily harm of Baby Briana.

{29} After examining each of the *Johnson* factors, the admission of Father's and Uncle's statements was harmless beyond a reasonable doubt as to Defendant's conviction for negligently permitting child abuse resulting in death or great bodily harm. Father and Uncle did not inculpate Defendant in any way with regard to their abuse of Baby Briana. The statements of Father and Uncle were merely additional evidence tending to prove what had already been demonstrated by physical evidence and Defendant's own testimony. Because the statements of Father and Uncle "did not serve to strengthen or corroborate the other evidence of guilt, we conclude [their] erroneous admission was harmless beyond a reasonable doubt with respect to [Defendant's] conviction" for negligently permitting child abuse resulting in death or great bodily harm. *Johnson*, 2004-NMSC-029, ¶ 53, 136 N.M. 348, 98 P.3d 998.

## II. Negligently Permitting Child Abuse Not Resulting in Death or Great Bodily Harm

{30} The charge of negligently permitting child abuse not resulting in death or great bodily harm pertains to the injuries inflicted on Baby Briana prior to the injuries that caused her death. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause,

causing or permitting a child to be ... placed in a situation that may endanger the child's life or health [or] tortured, cruelly confined or cruelly punished," not resulting in the child's death or great bodily harm. Section 30–6–1(D); *see also* § 30–6–1(E). Under this theory, the State was required to prove in relevant part that: (1) Defendant permitted Baby Briana to be placed in a situation which endangered the life or health of Baby Briana or permitted Baby Briana to be tortured or cruelly punished; (2) Defendant acted intentionally or with reckless disregard; (3) Defendant was a parent, guardian or custodian of the child, or Defendant had accepted responsibility for the child's welfare; and (4) this happened in New Mexico on or between February 27, 2002, and July 19, 2002.

{31} When we review the statements of Uncle and Father that might be relevant to the charge of negligently permitting child abuse not resulting in death or great bodily harm, we conclude that they are limited with regard to Defendant's actions or knowledge during the period of time between February 27, 2002, and July 19, 2002. Uncle makes no reference to Defendant's behavior prior to July 19, 2002, and Father's statement merely reiterates Defendant's own testimony to police. In his statement to police, Father admitted to throwing Baby Briana into the air with Baby Briana hitting her head on the ceiling four days before she died. He also admitted bruising Baby Briana, saying "I didn't mean for it to leave a bruise like that. Like I left her a bruise like that before, just from messing with her. [Mother] gets mad." Defendant's statement to police echoed what Father said. Defendant told police that, a couple of days prior to Baby Briana's death, she saw Father throwing Baby Briana up in the air and allowing her to come down. Defendant said that she told Father to stop because he was going to hurt the child.

{32} When we apply the *Johnson* factors to Father's testimony, we determine that the admission of Father's statement was harmless beyond a reasonable doubt as to Defendant's conviction for negligently permitting child abuse not resulting in death or great bodily harm. Father's statements were not particularly important to the prosecution's case because they conveyed very little information that was not provided in Defendant's own statement. Father's statement that he threw Baby Briana in the air and that Defendant knew he had bruised Baby Briana was cumulative in light of Defendant's own corroborative testimony that she had told Father to stop throwing Baby Briana because he was going to hurt her.

{33} While Defendant did not have the opportunity to cross-examine Father, this factor is substantially outweighed by the physical evidence in this case. The physical evidence showed that Baby Briana suffered from two skull fractures that occurred 5–7 days before her death. These injuries would have manifested themselves in striking behavioral changes. Baby Briana also suffered from two fractured ribs that occurred during her fourth and fifth months of life, which would have made it very painful for Baby Briana to be picked up, and she suffered a brain hemorrhage weeks before her death, as shown by the traces of iron left by the blood as her body reabsorbed it. She was violently shaken weeks before her death, causing an old retinal hemorrhage. The physical injuries to Baby Briana provide overwhelming evidence to support the charge of negligently permitting child abuse. When this physical evidence, coupled with Defendant's statement, is weighed against Father's statement, we conclude that the erroneous admission of Father's statement was harmless beyond a reasonable doubt with respect to Defendant's conviction for negligently permitting child abuse not resulting in death or great bodily harm.

{34} Finally, Defendant complains that Father's statement that Defendant would get mad at Baby Briana and pinch Baby Briana's ears and throw Baby Briana into her bouncy seat from a distance of about two feet was erroneously admitted at trial and contributed to her conviction. While we do find that the trial court erred in admitting this testimonial evidence without Defendant having the opportunity for cross-examination, we find this error was harmless. This statement supports the charge of intentional child abuse not resulting in great bodily harm. However, as to the charge of inten-

tional child abuse, the jury found Defendant not guilty. Thus, this error was clearly harmless. *See State v. Paul,* 83 N.M. 619, 621, 495 P.2d 797, 799 (Ct.App.1972) (concluding that because the testimony of a witness who was not sequestered related only to charge of which defendant was acquitted, not charge of which defendant was convicted, any error in allowing witness to remain was harmless).

## CONCLUSION

{35} We therefore reverse the Court of Appeals' decision to overturn Defendant's conviction and remand for a separate trial. We affirm Defendant's conviction and sentence.

{36} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER and PATRICIO M. SERNA, Justices.

EDWARD L. CHÁVEZ, Chief Justice, and RICHARD C. BOSSON, Justice (concurring in part and dissenting in part).

CHÁVEZ, Chief Justice (concurring in part, dissenting in part).

{37} I concur in the majority's holding that Mother's Sixth Amendment right to confrontation was violated when, despite the fact that Mother had no opportunity to cross-examine her co-defendants, the trial court admitted her co-defendants' out of court statements made during police interrogations. Additionally, although I believe the trial court's failure to sever the trials of the defendants makes this an extremely close case as to whether the jury may have convicted Mother for illegitimate reasons, I join the majority in upholding Mother's conviction for negligently permitting child abuse not resulting in death or great bodily harm. Even if the statements from her co-defendants are not considered, Mother's own out-of-court statements, which were introduced to the jury, support the conclusion that the error in admitting the statements in violation of Mother's right of confrontation was harmless beyond a reasonable doubt. Mother's statements included an admission that on more than one occasion she observed both Father and Uncle toss the baby in the air,

striking her head on the ceiling. She admitted having become angry with them for having done so and asking them to stop. These admissions, together with the medical evidence of abuse occurring days before the child's death, support a conclusion that the admission of the Father's and Uncle's statement was harmless error beyond a reasonable doubt.

{38} However, I am not persuaded that the statements from Mother's co-defendants relating to the events of the night of the child's death did not contribute to Mother's conviction for negligently permitting child abuse resulting in death or great bodily harm. As such, I respectfully dissent and would remand to the trial court for a new trial on the count relating to child abuse resulting in death or great bodily harm.

{39} Given the varying and somewhat confusing statements from the co-defendants, a jury might have drawn the reasonable inference that Mother was aware of the abuse on the night of the baby's death. For example, at one point, Father, in a statement denying any wrongdoing, said that he spent the night with Mother, the baby, and Uncle. When Father finally confessed to what he had done, he recounted that he threw the baby up in the air, striking her head on the ceiling, as did Uncle. When asked what Mother said when the baby was thrown up against the ceiling he replied "I don't even know, I don't even remember if she was awake or not." Several minutes later, when he acknowledged that he continued throwing the baby in the air, he was asked, "And where's your wife this whole time?" His reply, "She was there, too." He later claimed Mother passed out and was asleep at the time of the abuse.

{40} Uncle stated that on the night of the baby's death he was in the bedroom playing video games with Father and Mother. Although Mother consistently stated that she was asleep, not knowing the baby was being abused by Father and Uncle, the statements of the co-defendants are equivocal on this subject. Had Mother been afforded the opportunity to cross-examine her co-defendants, she may have been able to clarify whether everyone was in agreement that she

was asleep and unaware of any abuse of the baby during the night preceding the child's death. Whether a jury would have convicted Mother based on uncontroverted evidence that she was asleep and unaware of the abuse taking place is not the issue. The issue is whether there is a reasonable possibility that the statements admitted in violation of the Sixth Amendment might have contributed to Mother's conviction.

{41} The majority has interpreted the statements of Father and Uncle as "largely silent with regard to [Mother's] actions or knowledge during the last two days of [the baby's] life," and as not making "any reference to [Mother's] awareness of [their] activities." Maj. Op. ¶ 26. While this is certainly a reasonable interpretation of their statements, the jury also heard Father, at one point, say he did not know whether Mother was asleep, and, at another point, state that she was there while he was tossing the child against the ceiling. The Court of Appeals in describing Father's statement wrote, "Father's statement not only corroborates Mother's, [Father] specifically adds that he and Uncle made Baby hit the ceiling and dropped her onto the floor while they were throwing her and that Mother knew it." *State v. Walters*, 2006–NMCA–071, ¶ 41, 139 N.M. 705, 137 P.3d 645. The State contends that this description by the Court of Appeals is misleading because the implication that "mother knew" father was throwing the baby at the time he was doing so, is false. Indeed, argues the State, Father's statement was an attempt to establish an alibi for Mother, seemingly conceding the exculpatory value of Mother not being aware of Father's actions because she was asleep or passed out. By contrast, an interpretation of Father's statement, without the benefit of cross-examination, which leads to a finding that Mother was aware of the abuse taking place, is inculpatory evidence.

{42} Although I might interpret the statement more in line with the State's interpretation, the equivocal nature of the statement is for the jury to interpret and weigh. A reasonable jury may have accepted the portion of Father's statement where he said he did not know whether Mother was awake and

that Mother was there while he tossed the baby in the air, and have rejected any statement that she was passed out or asleep. Certainly such a reasonable inference or interpretation of the statement would contribute to a guilty verdict.

{43} The focus of harmless error analysis is "whether there is a reasonable possibility the erroneous evidence might have affected the jury's verdict." *State v. Johnson*, 2004–NMSC–029, ¶ 11, 136 N.M. 348, 98 P.3d 998. We must be able to determine, beyond a reasonable doubt, that the jury verdict would have been the same had the constitutional error not occurred. *Id.* ¶ 9.

[A] reviewing court [must] be guided not by its own assessment of the guilt or innocence of the defendant—a matter which is irrelevant to the question whether the constitutional error might have contributed to the jury's verdict—but rather by an objective reconstruction of the record of evidence the jury either heard or should have heard absent the error and a careful examination of the error's possible impact on that evidence.

*Id.* ¶ 10. In my judgment, the statements of the co-defendants allow a reasonable inference that Mother was aware of the abuse the night of the child's death. Therefore, I conclude that there is a reasonable possibility that the evidence complained of might have contributed to Mother's conviction.

{44} The prosecution vigorously resisted severance in this case. I conclude my analysis of this issue by reiterating what we wrote in *State v. Gutierrez*:

The zeal ... of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty.... When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless.... [T]he presumption is to be indulged, in

favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty.

2007–NMSC–033, ¶ 24, 142 N.M. 1, 162 P.3d 156 (2007) (quoting *State v. Frank*, 92 N.M. 456, 460, 589 P.2d 1047, 1051 (1979)).

{45} I would reverse Mother's conviction for negligent child abuse resulting in death or great bodily harm and grant her a new trial. The majority concluding otherwise, I respectfully dissent.

I CONCUR: RICHARD C. BOSSON, Justice.