IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-004

Filing Date: January 29, 2009

Docket No. 29,488

STATE OF NEW MEXICO

        Plaintiff-Appellee,

v.

JEROME LYNN "LENNY" HOLLY,

        Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY
James Waylon Counts, District Judge


Hugh W. Dangler, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Ralph E. Trujillo, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

BOSSON, Justice.

{1}     Kenneth Douglas was fatally shot in the back of the head while sitting in the driver's seat of a parked car outside the Atrium Club in Alamogordo, New Mexico.  His cousin, Jason Carrell, was sitting beside him in the front passenger seat and ran from the car after hearing the shot.  Carrell was then shot three times as he ran away but survived to call 911. Defendant Jerome Lynn Holly was the only other person in the car and was sitting in the backseat at the time of the shooting.  Carrell identified Defendant as the man who shot him.

1

**{2}** Defendant was convicted of first-degree murder of Douglas and attempted first-degree murder of Carrell, following a six-day jury trial in Alamogordo. Defendant raises four grounds on appeal, three of which we discuss only summarily. We address in more detail defense counsel's rejected request to voir dire the jury following potentially prejudicial publicity that arose mid-trial. In the course of our discussion, we incorporate into our jurisprudence Section 8-3.6(e) of the ABA Standards for Criminal Justice, Fair Trial and Free Press, which calls for a more aggressive analysis and voir dire procedure by our trial courts than our law has previously imposed. We ultimately conclude, however, that any error by the court in this instance was harmless, and for the reasons that follow, we affirm Defendant's convictions in all respects.

**BACKGROUND**

**{3}** Defendant was a former high school basketball star of local renown and his case received a fair amount of media coverage before and during the trial. At issue in this case is whether the trial court employed sufficient measures to anticipate and prevent potential prejudice as a result of that publicity.

**{4}** The jury was empaneled on Monday, November 29, 2004 and received extensive instructions from the trial judge, including the standard instruction to avoid news accounts of the trial and a warning not to consider any information learned outside of the courtroom. *See* UJI 14-101 NMRA. Before the jurors were dismissed for the evening, they were once again instructed to avoid and disregard any media coverage of the case.

**{5}** The next afternoon, the front page of the Alamogordo Daily News featured a banner headline above the fold reading "Holly Pleads Guilty to Charges." The article noted that Defendant had recently pleaded guilty to racketeering and tampering with evidence charges arising from the same series of events as the trial. The article also included information about the shooting and the victims, and contained statements from the prosecuting attorney implicating Defendant.

**{6}** Two days later, defense counsel alerted the trial court to the article and requested a voir dire to determine whether any of the jurors had been exposed to the article. The trial judge declined Defendant's request, reasoning that jurors are presumed to follow the court's instructions. Instead, the court promised to reissue its instruction to the jury to avoid and disregard the media, and the court repeated that admonition several times throughout the remainder of the trial.

**{7}** Defendant asks us to consider whether the trial court erred in refusing to canvass the jury to ascertain the facts about any exposure to the article or its headline. Although this Court has previously stated that voir dire is recommended but not required in these circumstances, more recent and compelling authority persuades us to revisit our earlier position.

2

**DISCUSSION**

**The Law to the Present**

**{8}**     This Court first addressed the issue of mid-trial publicity in *State v. Campos*, where the defendant alleged that he was prejudiced by an article in the local newspaper that alluded to his criminal history. 61 N.M. 392, 395, 301 P.2d 329, 331 (1956). The defendant argued that jurors might have read the local newspaper during an overnight recess, although counsel presented no evidence to that effect. *Id.* at 395-97, 301 P.2d at 331-32. In responding to the defendant, we observed that the jury had previously been instructed to avoid publicity about the trial, and stated that "[i]n order to predicate error on the action of the trial court . . ., we should have to assume a violation by the jurors, or some of them, of the trial court's admonition given on the eve of the recessing of the court for the night, and that prejudice resulted therefrom." *Id*. at 398, 301 P.2d at 333. Rather than speculate whether the jury might have violated the court's instructions, we relied instead on a presumption that jurors follow trial court admonitions to avoid outside material about the trial. We indicated that anyone challenging this presumption has the burden to present evidence of actual juror exposure. *Id.* at 397-98, 301 P.2d at 332-33.

**{9}**     Over the years, our courts have reaffirmed this rebuttable presumption. In *State v. Rose*, the defendant argued that "the jury should have been kept together because they might have been exposed to . . . or unduly influenced by prejudicial publicity." 79 N.M. 277, 280, 442 P.2d 589, 592 (1968). This Court answered that "we find no merit [in defendant's argument], because there is absolutely no showing of any prejudice, and without such showing we cannot speculate thereon." *Id.*; *see also State v. Lopez*, 80 N.M. 599, 605, 458 P.2d 851, 857 (Ct. App. 1969) (holding that defendant did not meet his burden to establish that "the jury saw, heard or was influenced by any of the publicity mentioned by defendant").

**{10}**     Our most recent discussion on mid-trial publicity occurred twenty-six years ago in *State v. Sandoval*, a case arising from the infamous Santa Fe prison riots. 99 N.M. 173, 655 P.2d 1017 (1982). In *Sandoval*, this Court addressed a factually similar issue when the trial court declined to conduct an individual voir dire of the jurors following mid-trial newspaper reports about the case. *Id.* at 174, 655 P.2d at 1018. The defendant argued that the publicity created a substantial risk of prejudice, and therefore that risk alone was sufficient to merit an individual voir dire even without evidence that any of the jurors had actually seen the articles involved. *Id.* at 176, 655 P.2d at 1020. We disagreed, stating that "[t]here is no case law in New Mexico which requires an individual voir dire in the absence of any proof or even an allegation that a juror has read a media article which could be prejudicial." *Id.*

**{11}**     In reaffirming the rebuttable presumption set forth in *Campos*, 61 N.M. at 398, 301 P.2d at 333, we expressed concern that an alternative procedure "would do little more than increase the complexity and time already involved in criminal trials. If not even an assertion of exposure is required, the court would have to voir dire the jurors after each recess, thereby

3

drawing attention to any publicity there may be." *Sandoval*, 99 N.M. at 176-77, 655 P.2d at 1020-21. Following *Sandoval*, we *recommended* that trial courts conduct voir dire of the jury under similar circumstances but ultimately left that decision to the discretion of the trial court. *Id.* at 177, 655 P.2d at 1021.

**The American Bar Association Standard**

{12} Despite this precedent, Defendant argues that our current approach is unworkable because it places a burden on the accused to produce evidence of actual juror exposure while the accused, once the jury is empaneled, has no meaningful access to the jury or its members. In evaluating this argument, we are informed by two important considerations persuasively articulated by the Colorado Supreme Court. *Harper v. People*, 817 P.2d 77 (Colo. 1991) (en banc).

{13} In *Harper*, the defendant raised the very issue we address in this appeal when the court refused to conduct a voir dire of the jury after a prejudicial article appeared in a local newspaper on the second day of trial. *Id.* at 79. At that time, Colorado employed a rebuttable presumption identical to that used in New Mexico, which presupposed that jurors would avoid mid-trial publicity pursuant to the trial court's instructions. Colorado placed the burden on the defendant to produce evidence of actual juror exposure to the prejudicial material. *Id.* at 80. The Colorado Supreme Court recognized the fundamental difficulties facing defendants in obtaining such evidence and ultimately discarded its rebuttable presumption in favor of the standard we consider below. Colorado analyzed two important considerations for this change.

{14} Foremost, the *Harper* court stated that "requiring independent evidence of the jury's exposure to outside information as a prerequisite to polling the jury fails to acknowledge the significant obstacles to obtaining such evidence," because jurors and the parties or their counsel are not to communicate during trial. *Id.* at 82. For example, in New Mexico, jurors are instructed to avoid communication with the attorneys, parties, witnesses, and spectators. *See* UJI 14-101 NMRA. Similar ethical considerations prevent counsel from communicating with jurors during trial. Accordingly, because our rules of ethics and procedure frustrate access to necessary information, the rebuttable presumption created by *Campos* becomes nearly impossible to overcome. 61 N.M. at 398, 301 P.2d at 333. In most cases, the defendant would have to wait for a juror to reveal voluntarily the fact of unauthorized exposure, an unlikely or at least unreliable circumstance on which to guarantee the accused's right to a fair trial before an unbiased jury. *Harper*, 817 P.2d at 83.

{15} Moreover, the presumption that jurors will follow the trial court's cautionary instructions overlooks the problem of accidental exposure. We can envision instances, for example, when a juror might inadvertently be exposed to mid-trial publicity. "If an article appeared in an inconspicuous location in a newspaper, . . . a juror could have read it in whole or in part before becoming aware that it related to the case being tried, or perhaps a family member, a co-worker, or a friend could have mentioned the article." *Id.* at 82. Depending

4

on the circumstances, jurors could pass by locations where the local paper is sold, and might find unavoidable an article—or at least the headline—prominently featured on the front page of the newspaper. Jurors might be exposed to prejudicial information in any number of ways without intentionally violating the court's instructions. Our case law simply does not address, or seemingly contemplate, the potentially devastating effects of inadvertent exposure.

{16}    For these reasons, we are compelled to conclude that our current standard does not adequately anticipate or redress the full potential for prejudice arising from mid-trial publicity. Therefore, we consider an alternate approach recommended in the ABA Standards for Criminal Justice, Fair Trial and Free Press.

{17}    The relevant ABA Standard states:

> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or should on the motion of either party question each juror . . . about exposure to that material. . . . The standard for excusing a juror who is challenged on the basis of such exposure should be the same as the standard of acceptability recommended in standard 8-3.5(b), except that a juror who has seen or heard reports of potentially prejudicial material should be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

*See* ABA Standards For Criminal Justice, Fair Trial and Free Press § 8-3.6(e) (3d ed. 1991).[1]

{18}    The ABA approach has been adopted in some form by the majority of federal circuits and in several states. *See, e.g.*, *United States v. Thompson*, 908 F.2d 648, 650-52 (10th Cir.1990); *Gov't of Virgin Islands v. Dowling*, 814 F.2d 134, 139-41 (3d Cir.1987); *United States v. Halbert*, 712 F.2d 388, 389 (9th Cir.1983); *United States v. Hood*, 593 F.2d 293, 296 (8th Cir.1979); *United States v. Herring*, 568 F.2d 1099, 1104-05 (5th Cir. 1978); *United States v. Perrotta*, 553 F.2d 247, 250 (1st Cir. 1977); *United States v. Jones*, 542 F.2d 186, 191 (4th Cir. 1976); *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969);

---

[1]ABA Standard § 8-3.5(b) states that "[w]henever prospective jurors have been exposed to potentially prejudicial material, the court should consider not only the jurors' subjective self-evaluation of their ability to remain impartial but also the objective nature of the material and the degree of exposure. The court should exercise extreme caution in qualifying a prospective juror who has either been exposed to highly prejudicial material or retained a recollection of any prejudicial material."

5

*Brown v. State*, 601 P.2d 221, 232 (Alaska 1979); *People v. Adcox*, 763 P.2d 906, 931 (Cal. 1988); *Harper v. People*, 817 P.2d 77, 83-84 (Colo. 1991) (en banc); *Lynch v. State*, 588 A.2d 1138, 1139 (Del. 1991); *Way v. State*, 774 So. 2d 896, 898 (Fla. Dist. Ct. App. 2001); *People v. Barrow*, 549 N.E.2d 240, 256-57 (Ill. 1989); *State v. Bey*, 548 A.2d 846, 866-67 (N.J. 1988); *Commonwealth v. Duddie Ford, Inc.*, 551 N.E.2d 1211, 1215 (Mass. App. Ct. 1990), *rev'd in part on other grounds by* 566 N.E.2d 1119 (Mass. 1991). Based on the reasons set forth below, we believe the problems inherent in our current standard are easily remedied by the ABA approach.

{19}    The ABA standards most commonly apply a three-step procedure. First, the trial court determines whether the publicity is inherently prejudicial. If so, the court undertakes to canvass the jury as a whole to assess whether any of the jurors were actually exposed to the publicity. Finally, in the event of exposure, the court conducts an individual voir dire of the juror to ensure that the fairness of the trial has not been compromised. *See, e.g.*, *Brown*, 601 P.2d at 232.[2]

{20}    To determine whether mid-trial publicity is inherently prejudicial, trial courts are advised to consider (1) whether the publicity goes beyond the record or contains information that would be inadmissible at trial, (2) how closely related the material is to matters at issue in the case, (3) the timing of the publication during trial, and (4) whether the material speculates on the guilt or innocence of the accused. In addition, the trial court should consider the likelihood of juror exposure by looking at (1) the prominence of the publicity, including the frequency of coverage, the conspicuousness of the story in the newspaper, and the profile of the media source in the local community; and (2) the nature and likely effectiveness of the trial judge's previous instructions on the matter, including the frequency of instruction to avoid outside materials, and how much time has elapsed between the trial court's last instruction and the publication of the prejudicial material. It is significant whether the trial court merely told the jury to disregard such material or whether the jury was properly instructed to avoid looking at such material altogether. *See, e.g.*, *Herring*, 568 F.2d at 1105; *Harper*, 817 P.2d at 84.

{21}    If, when considering any combination of these factors, the trial court can reasonably conclude that the material is likely prejudicial, it should proceed to the next step: voir dire. *See Harper*, 817 P.2d at 84. Any question as to the existence of prejudice should be resolved in favor of the accused. *Id*. "Once this . . . threshold inquiry is concluded, the district court

---

[2]If the voir dire reveals actual exposure, prior holdings from our Court of Appeals suggest that trial courts should individually voir dire the exposed juror and inquire into the possibility of bias to determine whether the juror should be excused and replaced by an alternate. *See, e.g.*, *State v. Gardner*, 2003-NMCA-107, ¶¶ 9, 12, 134 N.M. 294, 76 P.3d 47. Trial courts should exercise sound discretion and good judgment in determining whether to excuse the juror for cause, a decision to which we give considerable weight on appeal. *Id.*

6

should have a sound basis for deciding whether the appearance of the material before it calls for a voir dire examination of the jury members." *Herring*, 568 F.2d at 1105.

**{22}**    The ABA standard would not appear to portend any significant burden upon our trial courts, which retain some degree of discretion in implementing the standard and will not be required to voir dire the jury on every occasion. Rather, under the ABA standard, courts are asked to exercise a more informed discretion by first making an initial determination about the prejudicial effect of mid-trial publicity. *See Brown*, 601 P.2d at 232.  Only when mid-trial publicity presents a serious possibility of prejudice, does voir dire become mandatory. Therefore, by requiring voir dire when there is a sufficient possibility of prejudice, the ABA standard redresses the problem of accidental exposure.

**{23}**    Perhaps most significantly, the ABA standard makes more realistic the defendant's burden of persuasion.  The accused is no longer required to present evidence of actual juror exposure in recognition of the near impossibility of doing so.  However, the overall burden of persuasion remains with the defendant to show that the material is inherently prejudicial, which in turn gives rise to an *inference* of prejudice sufficient to compel a voir dire. *Herring*, 568 F.2d at 1103.  Upon canvassing the jury, the trial court will determine whether any actual exposure occurred, thereby eliminating the need for guesswork and conjecture.

**{24}**    Accordingly, we hold that trial courts should employ the ABA standard set forth in this opinion when alerted to mid-trial publicity.  The ABA standard helps ensure that defendants are tried by a jury free from the taint of partiality, and prevents "situations wherein a juror should not serve because his judgment regarding a defendant might be so colored that his impartiality would be destroyed and he could no longer render a fair consideration in the trial." *State v. Baca*, 99 N.M. 754, 756, 664 P.2d 360, 362 (1983).

**The Holly Trial**

**{25}**    Directing our attention to the present trial, the article in the Alamogordo Daily News is precisely the type of mid-trial publicity that merits an inference of prejudice under the ABA standard.  First, the article discusses Defendant's plea agreement to two criminal charges arising from the same series of events, information that goes outside the record of this trial and includes matters likely inadmissible at trial.  Second, the article specifically discusses the very same murder charges against Defendant and includes details of the shootings that may or may not have come out at trial.  Third, the article appeared in the newspaper early in trial—the second day—which increases the window for potential juror exposure. Finally, the article contains a statement by the prosecutor implicating Defendant, although the defense attorney made a contravening statement about Defendant's innocence.

**{26}**    Significantly, the article was prominently featured on the front page of a local paper in a small community.  One can reasonably foresee that a juror, passing by any location where the paper is sold—perhaps a newspaper box, a coffee shop, or a convenience store—would be exposed at very least to the banner headline:  "Holly Pleads Guilty to

7

Charges." Responsibly, the trial court cautioned the jury frequently during the trial, including on the very day before this article appeared. Nevertheless, the more prudent course would have been to canvass the jury to evaluate the likelihood of exposure.

{27} Although an inference of prejudice is justified, defense counsel was not without fault. The court was not consulted about the article until two days after publication. Such a delay can impair the effectiveness of remedial measures available under the ABA standard. Ideally, jurors should be questioned as soon as possible after potential exposure to assess any prejudice. An attorney who seeks the protections of the ABA standard also shoulders the responsibility to become aware contemporaneously of local publicity and to alert the trial court in a timely fashion.

**Harmless Error Analysis**

{28} Harmless error, particularly in the constitutional sense, avoids a retrial when an appellate court can determine, beyond a reasonable doubt, that "there is no reasonable possibility that the evidence complained of might have contributed to [the defendant's] conviction." *State v. Lopez*, 2007-NMSC-037, ¶ 22, 142 N.M. 138, 164 P.3d 19 (alteration in original) (internal quotation marks and citation omitted). Initially, the defendant has the burden to demonstrate prejudice. *State v. Duran*, 107 N.M. 603, 608, 762 P.2d 890, 895 (1988) ("[T]o establish . . . reversible error, the defendant must demonstrate prejudice"), *superseded by rule as stated in State v. Gutierrez*, 1998-NMCA-172, 126 N.M. 366, 969 P.2d 970. If the defendant meets this burden, the burden then shifts to the State to show that the error was harmless beyond a reasonable doubt. *See State v. Gutierrez*, 2007-NMSC-033, ¶ 18, 142 N.M. 1, 162 P.3d 156. Although we consider the strength of the prosecution's case a factor in our harmless error analysis, the "central focus of the inquiry . . . is whether there is a reasonable possibility the [prejudicial material] might have affected the jury's verdict." *State v. Stephen F.*, 2008-NMSC-037, ¶ 39, 144 N.M. 360, 188 P.3d 84 (internal quotation marks and citation omitted).

{29} Defendant's claim of jury contamination implicates his constitutional right to a fair and impartial trial. For the reasons discussed earlier, any jeopardy to that constitutional right necessarily presupposes actual juror exposure to the prejudicial publicity. Conversely, if no jurors were exposed in fact, then their impartiality could not have been affected, and no constitutional violation would have occurred. Accordingly, this case does not fit neatly within our harmless error jurisprudence because we have no record of whether any of the prejudicial information actually reached the jury. *See, e.g.*, *Lopez*, 2007-NMSC-037, ¶ 22. Notably, in the future the ABA standard will eliminate this obstacle; if the trial court concludes that the publicity is prejudicial, the judge will canvass the jury, and this Court will have a record of any possible prejudice.[3]

---

[3]Even in the event that the trial court determines that the mid-trial publicity is *not* inherently prejudicial, and therefore does not canvass the jury, we still have the benefit of that court's

8

**{30}** With respect to this particular case, Defendant could have requested that the jury be polled after the verdict to determine whether any juror had actually been exposed to the article. He did not do so, and as a result we have no way of knowing whether any harm actually occurred. We would have to speculate whether any of the jurors actually saw the article, and speculate again about what effect, if any, the article may have had on the verdict. We ought not reverse a criminal conviction on such guesswork. We can also see, with the benefit of hindsight, that most of the information in the article found its way into the trial record from other sources. Thus, the prospect of real prejudice to Defendant is minimal.

**{31}** Finally, the overwhelming weight of the incriminating evidence against Defendant at trial underscores our conclusion that any error was harmless. We highlight only the most salient evidence against Defendant in support of the verdict.

The prosecution established that Defendant flew back to El Paso from his residence in Atlanta on the day before the shooting. Defendant's cousin, Michael Holly, picked him up at the airport and drove him to Alamogordo. After arriving in Alamogordo, the men stopped at Michael's house to pick up a .38 caliber pistol that Michael had stored for Defendant. Forensic evidence established that a .38 caliber gun was used to shoot both Douglas and Carrell.

**{32}** The shooting occurred outside the Atrium Club in Alamogordo. Douglas, Carrell, and Defendant drove to the Atrium Club in Douglas' rental car and sat together inside the car while they waited for a friend to arrive. Douglas and Carrell were in the front seat, and Defendant sat alone in the back seat. Carrell, the surviving victim of attempted murder, provided an eyewitness account of the shooting. He testified that the shot that killed Douglas came from inside the car, and that Defendant, seated in the back seat, was the only other person there. An autopsy confirmed that Douglas had been shot in the back of the head behind his right ear at a close range. Carrell further testified that it was a hot day and the three men waited in the car with the air conditioning on and the windows rolled up. No windows were broken when police located the car, suggesting it was unlikely that the shot could have been fired by a third party from outside the vehicle. Carrell selected Defendant's picture from a photo lineup two weeks after the shooting and identified Defendant as his assailant.

**{33}** In addition, Michael Holly testified that on the afternoon of the shooting, he received a call from Defendant asking to be picked up at the Atrium Club. When Michael arrived, he saw Douglas's body on the ground outside the rental car, and at trial he described helping Defendant move Douglas's body into the trunk of the car where it was later discovered by police. As the two men drove away, Defendant acknowledged that he had shot both victims, and Michael so testified at trial. A second witness also testified that during a phone

---

review. We defer to the trial court's factual findings, but would review the determination of inherent prejudice de novo. If an appellate court determines that the material *is* inherently prejudicial, it may proceed to a harmless error analysis, as we do here.

conversation, Defendant confessed to shooting both men. Additional fingerprint evidence placed Defendant at the scene.

**{34}** Accordingly, even if we were to assume some juror exposure to the newspaper article, there is no reasonable possibility in our judgment that it contributed to Defendant's conviction. Because Defendant cannot point to any way the outcome of this case would have changed, this may not be an inappropriate case in which to recall the maxim that "'[a] defendant is entitled to a fair trial but not a perfect one.'" *State v. Moore*, 94 N.M. 503, 505, 612 P.2d 1314, 1316 (1980) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)) (alteration in original). We now briefly address Defendant's remaining claims of error, none of which have any merit.

**Ineffective Assistance of Counsel**

**{35}** At trial, the prosecution called Dale Yon, Defendant's roommate in Atlanta, to testify about the contents of several telephone conversations in which Defendant identified Douglas and Carrell as targets and later when Defendant confessed to shooting both men. Yon also stated that after he spoke to the Atlanta Police Department about the shootings, Defendant threatened Yon and his family. Yon was alleged to have recordings of those conversations, which he claimed to have turned over to the Atlanta police. Although the recordings were not used at trial, defense counsel protested that the tapes had never been disclosed and requested their production. The prosecution responded that all recordings in its possession had been produced, and that any recorded conversations between Yon and Defendant were inaudible.

**{36}** Defendant now contends he was denied effective assistance of counsel because his trial attorney failed to interview Yon properly prior to trial, and failed to discover evidence against Defendant. To prevail on this claim, "[D]efendant must first demonstrate error on the part of counsel, and then show that the error resulted in prejudice." *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (citing *Strickland v. Washington*, 466 U.S. 668, 690, 692 (1984)). Although the assistance provided by trial counsel is presumptively adequate, an attorney's conduct must not fall below that of a reasonably competent attorney. *See State v. Schoonmaker*, 2008-NMSC-010, ¶ 32, 143 N.M. 373, 176 P.3d 1105; *Bernal*, 2006-NMSC-050, ¶ 32. A defendant must also establish prejudice by demonstrating that counsel's errors were so serious that the result of the proceeding would have been different. *Schoonmaker*, 2008-NMSC-031, ¶ 32.

**{37}** Nothing suggests that defense counsel erred in this case, nor can Defendant show that, but for his attorney's error, the outcome of his trial would have been different. Significantly, the Yon tapes were not introduced into evidence at trial, and did not contribute to Defendant's convictions. The tapes could not have altered the outcome of the trial unless they contained exculpatory evidence. However, the record does not suggest that the recordings would have aided the defense. In fact, the record indicates that the tapes were inaudible, and therefore would have been equally fruitless for both sides. Without a showing

of either error or prejudice, Defendant's claim of ineffective assistance must fail. We reach this conclusion without prejudice or preclusive effect as to any habeas corpus proceedings Defendant may bring in the future. *See State v. Gonzales*, 2007-NMSC-059, ¶ 16, 143 N.M. 25, 172 P.3d 162 ("While Defendant has failed to establish a prima facie case of ineffective assistance of counsel, Defendant can still pursue habeas proceedings on this issue.").

**Expert Testimony Regarding Polygraph**

**{38}** Defendant contends that the court improperly admitted opinion testimony offered by the prosecution's polygraph examiner. Rule 11-707(C) NMRA governs the admission of such evidence. We will not disturb the trial court's decision absent a showing of abuse of discretion. *Lee v. Martinez*, 2004-NMSC-027, ¶ 11, 136 N.M. 166, 96 P.3d 291. "[A]ny doubt about the admissibility of scientific evidence should be resolved in favor of admission. The remedy for the opponent of polygraph evidence is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation." *Id.* ¶ 48, 136 N.M. at 181, 96 P.3d at 306 (citation omitted).

**{39}** On the threshold issue of admissibility, Defendant has presented no evidence to suggest that the trial court abused its discretion. The court allowed the State's polygraph expert to testify regarding an examination he performed on Michael Holly. Defendant was afforded the opportunity to cross-examine the State's polygraph expert on his method of examination and the reliability of his conclusions. Defendant presented rebuttal testimony from his own polygraph expert to show that the method of scoring the state's polygraph test was inaccurate. It was up to the jury to choose on which testimony it should rely. Because these are the same procedures recently recommended by this Court in *Lee*, the trial court did not abuse its discretion by allowing this testimony into evidence.

**Possibility that a Juror Viewed Defendant in Handcuffs**

**{40}** On the evening of the first day of trial, one member of the jury may have seen Defendant in handcuffs as he was escorted back to the detention facility. Defense counsel raised this issue with the trial court the following morning. When asked by the court how best to address this issue, counsel concurred with the prosecutor that the court should repeat its general jury instructions rather than calling specific attention to the incident. Defendant did not request a mistrial, did not ask the trial court to strike the affected juror, nor did Defendant seek a finding of prejudice. We therefore review the procedures employed by the trial court for fundamental error. *See State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 ("When the trial court had no opportunity to rule on a [claimed error] because the defendant did not object in a timely manner, we review the claim on appeal for fundamental error.").

**{41}** Although "a prisoner coming into court for trial is entitled to make his appearance free of shackles or bonds," prior cases have held that an inadvertent or insignificant exposure to a defendant in shackles is not sufficiently prejudicial to merit a new trial. *See State v.*

11

*Mills*, 94 N.M. 17, 21-22, 606 P.2d 1111 (Ct. App. 1980) (finding no prejudice where defendant was inadvertently seen by up to three jurors when he was escorted from the courtroom in handcuffs); *State v. Gomez*, 82 N.M. 333, 334, 481 P.2d 412, 413 (Ct. App.1971) (holding that a defendant's rights were not sufficiently prejudiced to justify a new trial when jurors viewed defendant in handcuffs before trial and during recess); *State v. Sluder*, 82 N.M. 755, 756-57, 487 P.2d 183, 184-85 (Ct. App. 1971) (denying defendant's motion for a mistrial when there was no evidence that any juror had seen the defendant in his prison clothes).

**{42}**    In this case it is unclear whether any exposure actually occurred, or if it did, that it was anything more than "inadvertent or insignificant exposure." Accordingly, we find no fundamental error where Defendant acquiesced in the very relief granted by the court, and where the court's decision aligned with controlling New Mexico authority.

**CONCLUSION**

**{43}**    We affirm Defendant's convictions.

**{44}**    IT IS SO ORDERED.

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**

**Topic Index for *State v. Holly*, No. 29,488**

**Appeal and Error**

AE-HE        Harmless Error

**Criminal Law**

CL-MU        Murder

**Criminal Procedure**

CA-EA        Effective Assistance of Counsel
CA-MC       Media Coverage

**Evidence**

EV-PX       Polygraph Examination

**Juries**

JR-VD       Voir Dire