**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-115**

**Filing Date: August 26, 2009**

**Docket No. 27,859**

**STATE OF NEW MEXICO**,

      **Plaintiff-Appellee,**

**v.**

**THERESA QUINTANA**,

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF QUAY COUNTY**
**Ricky D. Purcell, District Judge**

Gary K. King, Attorney General
Farhan Khan, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Stephanie Erin Brunson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**ROBLES, Judge.**

**{1}**     Theresa Quintana (Defendant) stood trial in February 2007 for violating NMSA 1978, Section 30-3-13(A)(1) (1995) (aggravated assault against a household member) and NMSA 1978, Section 30-15-1 (1963) (criminal damage to property).  A jury convicted her of the assault charge and acquitted her of the other.  Defendant now appeals her conviction, alleging that (1) the trial court abused its discretion in denying her motion for a continuance, (2) the jury selection process violated her right to due process and an impartial jury, and (3) there was insufficient evidence to support a conviction.  Although we hold that there was

1

sufficient evidence to support Defendant's conviction in this case, we nevertheless vacate the conviction because the jury selection process violated Defendant's rights to due process and an impartial jury. Accordingly, we reverse and remand for a new trial. We need not address Defendant's first argument because of the remand.

## I.    BACKGROUND

**{2}**    Shortly after midnight on January 30, 2006, police responded to a 911 call, reporting a domestic disturbance involving a woman with a gun. Police arrived and found Defendant sitting on the front porch of Patrick Arrellano's home. A pat-down of both Defendant and Arrellano revealed that neither of them was armed. Arrellano told the police that Defendant had pointed a gun at him, and he had grabbed the gun away and thrown the gun into a field. Arrellano further stated that Defendant had broken his bedroom window and had attacked his truck with a two-by-four. A search of the field by police uncovered a handgun. Defendant was arrested and, on June 8, 2006, a criminal information charged Defendant with one count of aggravated assault against a household member and one count of criminal damage to property (over $1000). In mid-January of 2007, Defendant had gone to trial on unrelated drug charges (first trial). Her trial in the present case was scheduled for February 6, 2007. This resulted in the use of substantially the same jury pool for both trials. Additional facts about the charges and about the composition of the jury will be developed in the context of the issues discussed.

## II.    DISCUSSION

**{3}**    We consider two issues raised by Defendant: Did the jury selection process violate her rights to due process and a fair and impartial trial and was there substantial evidence to support her conviction? We begin with the jury selection process.

### A.    Jury Selection Process

**{4}**    The facts surrounding the jury selection are not in dispute in this case. What remains are questions of law, which we review de novo. *See State v. DeGraff*, 2006-NMSC-011, ¶ 6, 139 N.M. 211, 131 P.3d 61.

**{5}**    Defendant's trial was originally set for December 19, 2006, but on November 28, 2006, the State requested and was granted a continuance due to a scheduling conflict. A request to extend the six-month rule was also filed by the State, with which Defendant agreed, and the district court approved. On December 19, Defendant learned that she was scheduled to go to trial on January 17, 2007 on unrelated drug charges. The day after the trial on the drug charges, Defendant learned that the trial in this case had been set for February 6, 2007. Additionally, Defendant learned that the jury pool for this case, consisting of forty-seven potential jurors, would be substantially comprised of individuals that sat through voir dire or were on the jury in her first case. Specifically, eight members of the jury pool in this case were on Defendant's first jury, twenty-two members of the jury pool

on this case sat through voir dire on the first case, and sixteen members of the jury pool on this case had no previous contact with either case.

**{6}** Defendant alerted the trial court to her concern about prejudice in a motion and petition both filed on January 26, 2007. In these pleadings, Defendant stated that more time was needed to prepare for trial, that forcing Defendant to go to trial in front of the same jury pool would be "extremely prejudicial," and that "her prior case may negatively influence potential jurors." The State did not concur in the granting of the motion or petition. On the morning of trial in this case, Defendant again requested a continuance. Defendant argued that a continuance was needed due to the lack of time to prepare for the trial. Further, Defendant argued that coming in front of the same jury pool unduly prejudiced her, and that extra-judicial knowledge of prior bad acts should not be given to the jurors because such information would be inadmissible in this case. Regarding the overlapping jury pools, the district court stated that it would allow those potential jurors that actually sat on the jury in the first trial to be challenged for cause without actually questioning them. Defendant did request that those eight jury pool members be struck before voir dire. Although the district court did allow those eight who were on the first jury to be struck for cause, it would appear from the record that they still sat through voir dire with the other thirty-nine members in the pool.

**{7}** At the opening of voir dire, the district court read the charges against Defendant and asked if any of the potential jurors knew Defendant. None of the potential jurors responded by referring to the first case. Defendant used all five of her peremptory challenges. Ultimately, the selection process resulted in a jury that included eight individuals who sat through voir dire in the first trial. Three of those eight had been preemptively struck by the defense in the first trial.

**{8}** Defendant points out that this issue about jury selection has never been substantially reviewed by an appellate court and requests this Court to provide direction to lower courts in similar situations. Relying on New Mexico Constitution, Article II, Sections 12 and 14, Defendant argues that her right to an impartial jury was violated by the empaneling of jurors who knew of other charges against her. According to Defendant, it was error for the jury to learn about her prior criminal history without regard to its admissibility subject to Rule 11-404(B) NMRA. Further, Defendant contends that the jury's knowledge of such information was irrelevant to the present case, it irreparably and needlessly tainted the jury in this case, there were no efforts to ensure impartiality of the jury pool, and dissemination of such information was knowingly sanctioned by the court. Defendant cites to cases in which a similar issue was decided. *See Leonard v. United States*, 378 U.S. 544 (1964) (reversing conviction and remanding for a new trial where members of a jury heard the verdict on the defendant's unrelated case before the start of the trial on which they served); *United States v. Mason*, 440 F.2d 1293 (10th Cir. 1971) (discussing a potential taint to a jury pool where members of a jury in a case that ended in mistrial sat through voir dire on the second trial). Defendant also cites to *Marrero v. State*, 343 So. 2d 883 (Fla. Dist. Ct. App. 1977) to support her proposition. In that case, the defendant had two trials that were one day apart. The potential jury pool for the second trial was comprised of individuals who heard voir dire

3

the day before on the first case and were aware of the defendant's other criminal charges. *Id.* at 884. The court reasoned that because it was error for a witness to testify about a defendant's arrest for an unrelated crime, it was similarly error for the jury to obtain information about a defendant's other criminal charges through the voir dire process. "[A] jury is bound to be unfairly prejudiced against the accused by reason of the knowledge of his arrest for another crime. Allowing the jury to sit through the voir dire of appellant's trial on totally separate charges on the preceding day clearly falls in the same category." *Id.*

**{9}** The State makes two arguments that support affirmance. First, the State argues that the jury in the this case was fair and impartial. To support its position, the State points out that Defendant was acquitted of the criminal damage to property charge and claims that Defendant has failed to show actual prejudice. Second, the State argues that the jury was thoroughly questioned and carefully instructed during voir dire. The jury affirmed that they understood that Defendant is presumed innocent and to determine the facts from the evidence produced in court.

**{10}** The State's double-pronged argument is similar to the analysis of the court in *United States v. Patterson*, 648 F.2d 625, 629 (9th Cir. 1981), which supports Defendant's position in the present case. There, half the prospective jurors on the defendant's case had also been prospective jurors on the defendant's other criminal trial a day earlier. *Id.* The court stated that "overlapping venires otherwise require reversal only if (1) the specific circumstances suggest a significant risk of prejudice and (2) examination or admonition of the jurors fails to negate that inference." *Id.* The court concluded that there was a significant risk of prejudice because the offenses were similar, and the trials were only one day apart. *Id.* Likewise, the court determined that the examination of the potential jury on voir dire did not specifically target the experience that some of the potential jurors had of the previous trial and did not negate the inference of prejudice. *Id.* at 630.

**{11}** We disagree with the State. A defendant in a criminal trial has the right to a fair and impartial jury. The New Mexico Constitution, Article II, Section 12 provides that "[t]he right of trial by jury as it has heretofore existed shall be secured to all and remain inviolate." Similarly, Article II, Section 14 of the New Mexico Constitution guarantees defendants an "impartial jury," which means "a jury where each and every one of the twelve members constituting the jury is totally free from any partiality whatsoever." *State v. McFall*, 67 N.M. 260, 263, 354 P.2d 547, 548 (1960); *see State v. Holly*, 2009-NMSC-004, ¶ 17, 145 N.M. 513, 201 P.3d 844 (noting with approval the ABA Standards For Criminal Justice, Fair Trial and Free Press, Section 8-3.6(e) (3d ed. 1991), which states:

> The standard for excusing a juror who is challenged on the basis of such exposure [to material beyond the scope of which the case is to be submitted] should be the same as the standard of acceptability recommended in standard [Section] 8-3.5(b), except that a juror who has seen or heard reports of potentially prejudicial material should be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

4

*Id.* (internal quotation marks omitted).)

**{12}**    ABA Standard Section 8-3.5(b) states:

> Whenever prospective jurors have been exposed to potentially prejudicial material, the court should consider not only the jurors' subjective self-evaluation of their ability to remain impartial but also the objective nature of the material and the degree of exposure. The court should exercise extreme caution in qualifying a prospective juror who has either been exposed to highly prejudicial material or retained a recollection of any prejudicial material.

**{13}**    In *State v. Garcia*, this Court provided the reasoning behind limiting evidence of other offenses:

> A person put on trial for an offense is to be convicted if at all on evidence showing he is guilty of that offense.  The defendant is not to be convicted because, generally, he is a bad man, or has committed other crimes.  Evidence of other offenses tends to prejudice the jury against the accused and predispose the jury to a belief in the defendant's guilt.

83 N.M. 51, 53, 487 P.2d 1356, 1359 (Ct. App. 1971).  This is just the type of prejudice Defendant asserts occurred in this case.

**{14}**    In *Holly*, our Supreme Court examined the possible prejudicial impact on a jury of mid-trial publicity.  2009-NMSC-004, ¶ 8.  *Holly* adopted a three-step procedure to guard against jury exposure to potentially harmful publicity.  *Id.* ¶¶ 18-19.

> First, the trial court determines whether the publicity is inherently prejudicial. If so, the court undertakes to canvass the jury as a whole to assess whether any of the jurors were actually exposed to the publicity.  Finally, in the event of exposure, the court conducts an individual voir dire of the juror to ensure that the fairness of the trial has not been compromised.

*Id.* ¶ 19.  The approach that the Supreme Court took in determining whether publicity is prejudicial is helpful here.  The Supreme Court advised district courts that, in their initial determinations, they should consider (1) whether the publicity goes beyond the record, or contains information that would be inadmissible at trial; (2) how closely related the material is to matters at issue in the case; (3) the timing of the publication during trial; and (4) whether the material speculates on the guilt or innocence of the accused.  In addition, the district court should consider the likelihood of juror exposure.  *Id*. ¶ 20.

**{15}**    Other courts have found prejudice in similar situations concerning overlapping jury pools. *See Leonard v. United States*, 378 U.S. 544, 544-45 (1964) (holding that where five members of a jury had heard a guilty verdict in the defendant's previous unrelated case, it was plainly erroneous to allow the second conviction to stand); *United States v. Gillis*, 942

5

F.2d 707, 710-11 (10th Cir. 1991) (finding a significant risk of a biased jury where members of the defendant's jury had been potential jurors on a separate case involving the defendant a month earlier); *Wilding v. State*, 427 So. 2d 1069, 1070 (Fla. Dist. Ct. App. 1983) (holding that a defendant's right to a fair trial was violated when the jury was improperly made aware of the defendant's prior criminal charges). Under the facts of the instant case, we conclude that the knowledge by a majority of the jury of another criminal charge was inherently prejudicial which, in turn, gives rise to an inference of prejudice. *See Holly*, 2009-NMSC-004, ¶ 23. The mere fact that Defendant was acquitted of one charge does not negate the inference of prejudice and does not by necessity preclude the fact that there are "situations wherein a juror should not serve because his judgment regarding a defendant might be so colored that his impartiality would be destroyed and he could no longer render a fair consideration in the trial." *State v. Baca*, 99 N.M. 754, 756, 664 P.2d 360, 362 (1983).

**{16}** Having determined that there was an inference of prejudice, we turn to whether examination or admonition of the jurors during voir dire failed to negate that inference. The State argues that the jury was questioned during voir dire, and they affirmed that they understood that "irrespective of anything in the past, [Defendant] is presumed to be innocent." Moreover, the jury was instructed that they were to determine the facts from "the evidence received in court." Finally, the State cites to *State v. Case* and contends that there is a "presumption that the jury obeyed its instructions." 100 N.M. 714, 720, 676 P.2d 241, 247 (1984). We are not convinced.

**{17}** The issue in *Case* involved alleged juror misconduct, not jury exposure to information about a defendant's criminal history without the safeguards of Rules 11-403 NMRA and 11-404(B). *See Case*, 100 N.M. at 720, 676 P.2d at 247. Secondly, the record reveals that this jury pool was asked general questions about prejudice and was given general instructions about what it was to consider. In *Patterson*, the court noted there was no examination during voir dire that was specifically targeted at the existence of the previous trial. 648 F.2d at 630. The court in that case concluded that the questions did not negate the inferences of prejudice because they were apparently asked in such a manner so as to avoid conveying information and tainting the jury. *Id.* "[Q]uestions [should be] sufficiently specific in scope and direction to provide any reasonable assurances that prejudice would be discovered if present." *Id.* (internal quotation marks and citation omitted). As the court noted, it should be possible to ask questions of potential jurors to detect prejudice without creating it. If that proves to be an impossible task, jurors who are likely to be prejudiced must be excused. *Id.* at n.9; *see Gillis*, 942 F.2d at 710 (holding that catch-all questions about impartiality were insufficient to ensure an unbiased jury).

**{18}** We acknowledge that there may be times when the examination or admonition of jurors on voir dire may be adequate to overcome an inference of prejudice. *See United States v. Parmley*, 108 F.3d 922, 923-24 (8th Cir. 1997) (holding that there was no error when the defendant's first case ended in mistrial, and members who sat through voir dire in the first case also sat through voir dire in the second because of specific questions that probed for possible sources of prejudice and the lack of showing that any jurors knew about the defendant's prior criminal history); *see United States v. Hurley*, 746 F.2d 725, 727-28

6

(11th Cir. 1984) (holding that the specific questioning about a case that some members of the jury pool sat through voir dire a day earlier that was related to the case at bar explored the possible sources of prejudice and provided reasonable assurances that any actual prejudices would come to light).

**{19}** In this case, the record of the voir dire and of the jury instructions is void of any reference to Defendant's previous trial. General, catch-all questions about whether potential jury members knew of any reason why their impartiality may have been impaired could not have ensured an unbiased jury. The questions were not specific enough to either elicit responses about the potential jurors extraneous knowledge, or to alert all parties that the overlapping potential jurors may pre-judge Defendant's guilt. After denial of the motion to continue, and the motion to strike any jurors that sat on the previous panel, defense counsel was in the untenable position of attempting to uncover any bias associated with the first case, while at the same time not tainting the potential jurors who did not know about the first case. The sum of the questions asked by the district court, defense, and State, were insufficient to uncover specific prejudice, and no other precautions were taken that may have mitigated the effect of the prejudice.

### B.   Sufficiency of the Evidence

**{20}** Because Defendant would be entitled to a dismissal of the charges on remand if the evidence adduced at trial was insufficient to support her convictions, this Court must also address Defendant's challenge to the sufficiency of the evidence. *See State v. Santillanes*, 109 N.M. 781, 782, 790 P.2d 1062, 1063 (Ct. App. 1990). In determining whether there is sufficient evidence to support a conviction, we ask whether a rational jury could have found the essential elements beyond a reasonable doubt. *State v. Barber*, 2004-NMSC-019, ¶ 33, 135 N.M. 621, 92 P.3d 633. This Court views the evidence in the light most favorable to the verdict and resolves all conflicts and indulges all reasonable inferences in favor of the verdict. *State v. Apodaca*, 118 N.M. 762, 766, 887 P.2d 756, 760 (1994). To the extent that we must interpret New Mexico's statutes, we do so de novo. *State v. Duhon*, 2005-NMCA-120, ¶ 10, 138 N.M. 466, 122 P.3d 50.

**{21}** To find Defendant guilty of aggravated assault on a household member, the jury was required to find beyond a reasonable doubt that (1) Defendant pointed a firearm at Arrellano; (2) Defendant's conduct caused Arrellano to believe that she was about to intrude on his bodily integrity or personal safety by touching or applying force to him in a rude, insolent, or angry manner; (3) a reasonable person in the same circumstances as Arrellano would have the same belief; (4) Defendant used a firearm; (5) Arrellano was a household member; and (6) this happened in New Mexico on or about January 30, 2006. *See* UJI 14-305 NMRA.

**{22}** Initially, Defendant argues that the evidence presented at trial does not support a finding beyond a reasonable doubt that she assaulted Arrellano with a weapon. The record reflects that the jury heard testimony from Arrellano that Defendant came over to his house, pointed a gun at his head and chest, stated that she was "going to shoot [him]," and he believed that she was going to shoot. Additionally, there was testimony from a police officer

7

who found a gun in a field by Arrellano's house not long after responding to the 911 call. The gun was identified as a Ravens brand gun, and the police officer testified that a search of Defendant's house revealed a Ravens brand firearms box. Defendant testified that there was a Ravens brand gun that belonged to the firearms box found in her home, but that Arrellano had taken the gun at some point earlier in their relationship. These two conflicting stories boil down to a question of credibility, which is the unique province of the finder of fact. This Court will not engage in reweighing evidence, or in substituting its judgment for that of the fact finder. *State v. Ware*, 118 N.M. 703, 705, 884 P.2d 1182, 1184 (Ct. App. 1994).

**{23}** Defendant also contends that, on the date in question, she was not a "household member" as stated in the jury instructions because she and Arrellano had "officially ended their relationship a week prior to the altercation."

**{24}** NMSA 1978, Section 30-3-11 (1995) states:

> [H]ousehold member means a spouse, former spouse or family member, including a relative, parent, present or former step-parent, present or former in-law, a co-parent of a child *or a person with whom a person has had a continuing personal relationship. Cohabitation is not necessary to be deemed a household member for the purposes of the Crimes Against Household Members Act.*

(Emphasis added.) (Internal quotation marks omitted.) The record reflects that the jury was given this definition before deliberation. Defendant testified that she had gone to Arrellano's house in order to get some of her personal property. The definition for "household member" is clear in a plain and ordinary interpretation. The jury in this case correctly interpreted that a continuing personal relationship has a broader meaning than what is suggested by Defendant regarding the couple's official relationship status.

**{25}** Finally, Defendant maintains that there was insufficient evidence to show that "Arrellano was placed in fear from the assault." That is not the correct standard. Uniform Jury Instruction 14-305 simply requires a showing that a defendant's conduct caused the victim to believe that the defendant was about to intrude on the victim's bodily integrity or personal safety by touching or applying force to the victim in a rude, insolent, or angry manner. As stated above, Arrellano testified that he thought Defendant was going to shoot him.

**{26}** We have reviewed Defendant's claims and conclude that they have no merit. Accordingly, we hold that there was sufficient evidence such that a jury could convict Defendant of aggravated assault on a household member, contrary to Section 30-3-13(A)(1).

## III.   CONCLUSION

**{27}** For the above reasons, we conclude that the jury selection process was fundamentally unfair and a violation of Defendant's rights to due process and an impartial jury. We also conclude that the evidence was sufficient such that a jury could find Defendant guilty of aggravated assault on a household member. We reverse the conviction and remand for a new trial.

**{28}   IT IS SO ORDERED.**

                                        _____

                                          **ROBERT E. ROBLES, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**CELIA FOY CASTILLO, Judge**

**Topic Index for *State v. Quintana*, No. 27,859**

| | |
|---|---|
| **CL** | **CRIMINAL LAW** |
| CL-DO | Domestic Violence |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CU | Continuance |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| | |
| **JG** | **JUDGES** |
| JG-AD | Abuse of Discretion |
| | |
| **JR** | **JURIES** |
| JR-IJ | Impartial Jury |
| JR-JG | Juries, General |
| JR-JS | Jury Selection |