**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2011-NMCA-026

Filing Date: January 13, 2011

Docket No. 29,265

CHISOS, LTD.,

Plaintiff-Appellant,

v.

JKM ENERGY, L.L.C.,

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Ralph D. Shamas, District Judge**

Sonnenschein Nath & Rosenthal LLP
Barry F. Cannaday
Dallas, TX

Marek & Francis, P.A.
Jay L. Francis
Carlsbad, NM

for Appellant

Hinkle, Hensley, Shanor & Martin, L.L.P.
Richard E. Olson
Jared A. Hembree
Roswell, NM

for Appellee

## OPINION

**BUSTAMANTE, Judge.**

**{1}** This case involves a dispute over the ownership of certain interests in two oil wells—the Stetson well and the HL2 well—both of which are located in the W/2 of Section

2, Township 19 South, Range 29 East, N.M.P.M., Eddy County, New Mexico (the W/2 of Section 2). The case presents two issues: (1) Did the "Conveyance and Bill of Sale" Appellant Chisos, Ltd. (Chisos), and Appellee JKM Energy, L.L.C. (JKM) entered into convey all of Chisos' operating rights in the W/2 of Section 2, or did it convey rights only in the Stetson well? (2) Is the district court's finding that Chisos failed—in bad faith—to give JKM proper notice of its intent to "recomplete the HL2 Well" supported by substantial evidence?

{2}     After a bench trial on the merits, the district court found the conveyance to be ambiguous and interpreted it as a conveyance of all of Chisos' rights in the W/2 of Section 2. The district court also ordered Chisos to provide JKM with an accounting of the costs and revenues of the HL2 well and an opportunity to retroactively elect to participate. We affirm.

## I.     BACKGROUND

{3}     On August 17, 2005, Jack Matthews, president of JKM, made an offer to Sue Ann Craddock, president of Chisos, to purchase "the Stetson #1 in Eddy County, New Mexico" for $43,000. The offer indicated that JKM desired to obtain "100% of the [working interest] and all of the [net revenue interest]." Chisos countered that it would be willing to "sell [JKM a] 100% Working Interest and a 75% Net Revenue Interest for $55,000."

{4}     JKM prepared a conveyance for the deal. The conveyance was for the entire W/2 of Section 2, not simply for the Stetson well. Both the Stetson well and the HL2 well were located in the W/2 of Section 2. The HL2 well was one of dozens of wells that could be seen from the Stetson well. Although Matthews had worked on the HL2 well before, he was not aware at the time he made the offer that it was in the W/2 of Section 2.

{5}     Craddock was not satisfied with the conveyance. She testified that she called Matthews and clearly explained that Chisos was willing to make a wellbore conveyance only. Matthews testified that a call took place, but that Craddock was worried mainly about a royalty override. The district court found Matthews to be more credible. Craddock prepared a new conveyance, which she signed and forwarded to Matthews. Craddock testified that her intent in preparing this new conveyance was to convey only the wellbore. Starting with the original conveyance, Craddock added sections from other documents in her possession and removed or changed language she felt was inappropriate. Matthews signed the "Conveyance and Bill of Sale" forwarded by Craddock and recorded it on September 30, 2005. A copy of the document is attached as Appendix 1.

{6}     The HL2 and Stetson wells were subject to a joint operating agreement (JOA). At the time the JOA was executed, Pure Energy Group, Inc. (Pure) had a 50% interest in both wells, and Bellwether Exploration Company (Bellwether) also had a 50% interest in both wells. Chisos acquired Bellwether's interest when it purchased the W/2 of Section 2. Among other things, the JOA contained a procedure for parties to elect whether to participate in the drilling and reworking of the wells. If a party elected to participate, it would share the costs of the work. If it elected not to participate, the participating parties would receive its

share of the profits from the well until those profits amounted to six times the non-consenting party's share of the participation costs.

**{7}** About two months after the conveyance was recorded, Chisos received notice from the State of New Mexico that the HL2 well had shown no production for the previous twelve months. Chisos understood this notification to mean that it was required to either plug the HL2 well or return it to production. In August 2006 Chisos obtained a non-consent election from Pure in anticipation of bringing the HL2 well back online. Chisos then sent a crew to the HL2 well to fracture the well. On October 19, 2006, Matthews saw the crew and informed them that Chisos was trespassing on his well. Chisos immediately stopped work on the HL2 well.

**{8}** Chisos filed its lawsuit against JKM on November 2, 2006. Several months later, Chisos decided to proceed with the work, apparently assuming that JKM had no interest in the HL2 well. On March 13, 2007, in lieu of obtaining another letter of non-consent, Chisos acquired a limited term assignment of Pure's rights in the HL2 well. Chisos also arranged for a workover rig to be at the HL2 well by May 8, 2007. Once again, Matthews only learned of the work on the HL2 well when he happened to be on site and noticed it. JKM communicated to Chisos that, pursuant to this litigation, JKM asserted rights in the well. Chisos responded by sending JKM an election letter. The letter, which purported to give JKM forty-eight hours to make its decision, was faxed late on a Friday afternoon and required JKM to commit almost $170,000 or elect not to participate. The forty-eight-hour deadline was based on a provision of the JOA that allowed for a reduced deadline if a drilling rig was on the premises. The letter claimed that this provision applied because a "drilling/workover" rig was on the premises. Craddock testified that the rig was a workover rig, and that drilling rigs and workover rigs were not the same.

## II.    DISCUSSION

**{9}** On appeal, Chisos raises questions about the interpretation of the conveyance and about the obligations of the parties under the joint operating agreement. We address the issues in the order they were raised.

### A.    Ambiguity of the Conveyance

**{10}** Chisos contends that the district court's conclusion that the "Conveyance and Bill of Sale" was ambiguous was in error. Ambiguity exists if the contract is "reasonably and fairly susceptible of different constructions." *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). A court may hear evidence of the circumstances surrounding the making of the contract in order to determine if it is unclear. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508-09, 817 P.2d 238, 242-43 (1991). In fact, "[w]ithout a full examination of the circumstances surrounding the making of the agreement, ambiguity or lack thereof often cannot properly be discerned." *Mark V*, 114 N.M. at 781, 845 P.2d at 1235. The existence of ambiguity is an issue of law that we review de novo. *Id.* at 782, 845 P.2d at 1236.

3

**{11}** The circumstances surrounding the making of the contract were discussed at length at trial. The original conveyance prepared by JKM was for the entire W/2 of Section 2. Craddock testified that Chisos desired to convey only the Stetson well. To accomplish this, Craddock asserted she modified the original conveyance, incorporating fragments from other assignments she had used previously. The district court concluded that under these circumstances, Chisos was aware of JKM's intent, but JKM was not aware of Chisos' intent.

**{12}** Craddock's modifications created significant ambiguities. As Craddock observed, her modified conveyance contained language referring to a lease and to the conveyance of operating rights that she should have removed. Chisos' own expert testified that "there were some questions in [his] mind as to exactly what the parties intended with some of the language that they used." Chisos' expert also frequently referenced the document's ambiguity. On cross-examination, Chisos' attorney led JKM's landman expert Carl Shellinger to admit that the conveyance was "very ambiguous" and that "reasonable people could interpret it either way." Chisos' cross-examination of JKM's legal expert, Phil Brewer, also resulted in admissions that the conveyance was confusing and ambiguous. Brewer also testified at length as to the impediments to clear title that the conveyance language caused.

**{13}** Chisos asserts that this issue "was preserved in the court below through [r]equested [f]indings of [f]act and [c]onclusions of [l]aw." We harbor some concern about this assertion. Chisos began its opening argument by noting that "[b]oth sides agree that there is [sic] some potential ambiguities in the conveyance." Chisos made JKM's experts admit the conveyance was ambiguous. And Chisos requested a conclusion of law that the conveyance was "ambiguous on its face." In fact, the only time at trial that Chisos suggested the document was not ambiguous was during its closing statement. Perhaps these persistent attempts to obtain a result opposite to the one Chisos now advocates could be said to have "fairly invoked a ruling . . . on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987). However, even if this were true, "[a] party who has contributed . . . to perceived shortcomings in a [district] court's ruling should hardly be heard to complain about those shortcomings on appeal." *Cordova v. Taos Ski Valley, Inc.*, 121 N.M. 258, 263, 910 P.2d 334, 339 (Ct. App. 1995).

**{14}** In any event, it is clear that the conveyance is ambiguous. Ultimately, nobody who testified was willing to state that the conveyance was unambiguous. Chisos' expert thought it was closer to a wellbore assignment. JKM's experts thought it was closer to an assignment of lease or operating rights. We agree with the district court that neither interpretation is necessarily wrong. Since the conveyance is reasonably susceptible to different constructions, we conclude that it is ambiguous.

**B.      Interpretation of the Conveyance**

**{15}** Chisos next contends that the district court erred in determining that the ambiguous language was not a wellbore assignment. We have said that "[o]nce [an] agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact." *Mark V*, 114 N.M. at 781, 845 P.2d at 1235. Factual issues include evidence which is "in dispute,

4

turns on witness credibility, or is susceptible of conflicting inferences." *C. R. Anthony*, 112 N.M. at 510, 817 P.2d at 244. "We review factual questions for substantial evidence. Substantial evidence is relevant evidence that a reasonable mind would find adequate to support a conclusion." *Sitterly v. Matthews*, 2000-NMCA-037, ¶ 22, 129 N.M. 134, 2 P.3d 871 (citation omitted).

**{16}** When the parties attach different meanings to the same terms, we apply the test from the Restatement (Second) of Contracts § 201 (1981) (Restatement) to determine their meaning. *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 17, 139 N.M. 750, 137 P.3d 1204. The Restatement provides that

> (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
>
> > (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
> >
> > (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

Restatement § 201(2). This inquiry is a question of law based on findings of fact. "We review legal questions de novo." *Consol. Elec. Distribs., Inc. v. Santa Fe Hotel Group, LLC*, 2006-NMCA-005, ¶ 7, 138 N.M. 781, 126 P.3d 1145.

**{17}** Applying Restatement Section 201, the district court concluded that the conveyance should be interpreted in favor of JKM. The district court provided findings of fact to support its conclusion. First, it found that "Chisos knew or had reason to know that JKM intended for the Conveyance and Bill of Sale . . . to be a conveyance of all of Chisos' operating rights in the W/2 of Section 2." Second, it found that "JKM did not know or have reason to know that Chisos intended the Conveyance and Bill of Sale . . . to be a producing wellbore assignment only." These findings would support a decision in favor of JKM under either Section 201(2)(a) or Section 201(2)(b) of the Restatement.

**{18}** The district court did not err if these findings of fact are supported by substantial evidence. We first examine the district court's finding that Chisos knew or had reason to know that JKM intended the conveyance to encompass all of Chisos' operating rights covering in the W/2 of Section 2. Both parties agree that the original conveyance sent by JKM to Chisos was a conveyance of operating rights covering all of W/2 of Section 2. The only evidence suggesting that JKM's intentions might have changed was Craddock's testimony regarding her phone conversation with Matthews prior to changing the conveyance. However, the district court did not credit this testimony. We cannot second-guess the district court's decision in this regard. We conclude that this evidence is adequate to support at least the conclusion that Chisos should have known of the meaning attached by JKM.

5

**{19}** We next examine the district court's finding that JKM was unaware of Chisos' intent. The district court found that Craddock had never informed Matthews of Chisos' intent to convey only the wellbore. Although Craddock and Matthews presented conflicting testimony on this point, the district court found Matthews to be more credible. As this finding relates to witness credibility, we defer to the fact finder. *See State v. Quintana*, 2009-NMCA-115, ¶ 22, 147 N.M. 169, 218 P.3d 87. Furthermore, Matthews was not aware that any other wells were on the W/2 of Section 2. The experts also noted that wellbore conveyances were uncommon. Accordingly, Matthews had no reason to think that Craddock was proposing a wellbore conveyance. To the extent that Chisos argues that the use of well names in various communications put JKM on notice of Chisos' intent, we note that JKM's experts testified that it was common for parties to refer to properties by well name. Chisos' expert said this was not common, but conceded that Matthews might have used the term that way. Under these conditions, we conclude that the district court's finding that Craddock's changes to the conveyance "would not have reasonably prompted . . . Matthews to think that the transaction involved only a wellbore interest" is supported by substantial evidence.

**{20}** Because we conclude that a reasonable mind would find the above evidence adequate to support the district court's findings of fact, the findings are supported by substantial evidence. Applying Section 201 of the Restatement, we hold that the district court did not err in assigning to the conveyance the meaning intended by JKM. Further, given that significant evidence addressing the meaning of the conveyance was presented at trial, we need not address Chisos' argument about canons of construction. *See Mark V*, 114 N.M. at 782, 845 P.2d at 1236 (observing that canons of construction may be used to interpret contracts as a matter of law when no evidence is presented to decide the issues as a matter of fact). Accordingly, we affirm the district court's interpretation of the "Conveyance and Bill of Sale."

## C.    Breach of the Operating Agreement

**{21}** Chisos appeals the district court's conclusion that it violated its obligations under Section VI.A of the JOA and under the Oil Conservation Division (OCD) regulation 19.15.3.104. "Breach of contract is a question of fact that we review under a substantial evidence standard." *Collado v. City of Albuquerque*, 2002-NMCA-048, ¶ 15, 132 N.M. 133, 45 P.3d 73.

**{22}** The district court found that the conveyance made JKM a party to the JOA. As such, JKM was "entitled to the protections and rights provided therein." By virtue of its limited term acquisition of Pure's interest in the HL2 well, Chisos was also a party to the JOA. Under Section VI.A.1 of the JOA, Chisos was required to give JKM notice of its intent to recomplete the HL2 well and allow JKM thirty days to elect whether or not to participate in the operations. However, the district court determined that Chisos did not provide the required notice, but instead "made a disingenuous and bad faith attempt to force JKM to opt out of the operations in regard to HL2, and contrary to the JOA, gave JKM only [forty-eight] hours to commit to the expenditure of $170,000." JKM did not respond to the notice. Chisos went ahead with the operations and, between August 2007 and May 2008, the HL2 well produced $367,539 of product. The district court ordered Chisos to prepare an

accounting of all costs and proceeds of the HL2 well and to give JKM at least thirty days to elect either to pay its 50% share of the costs or to elect not to participate under the JOA.

**{23}** Chisos argues that the district court's finding that it had violated Section VI.A.2 of the JOA was in error because of language in that section that states:

> Notwithstanding the provisions of this Section VI.A.2., it is agreed that without the mutual consent of the parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless the well conforms to the then-existing well spacing pattern for such source of supply.

Chisos maintains that returning the HL2 well to production conformed with the then-existing spacing pattern. However, Section VI.A.2 only applies if "either party receiving a notice elects not to participate in the proposed operation."

**{24}** Election can only happen after notice. The district court's findings were directed to the inadequacy of Chisos' notice to JKM. Notice is governed by Section VI.A.1, which requires a party desiring to rework a well to provide thirty-days written notice of proposed operations. As discussed below in the discussion of bad faith, there is substantial evidence that Chisos could have provided such notice but did not. Because the district court's finding of breach related to the notice provisions found in Section VI.A.1, this same evidence is substantial evidence of breach.

**{25}** Chisos also argues that the district court erred in finding that Chisos violated 19.15.3.104(C)(2) NMAC (10/21/2001) (replaced by 19.15.15.10 NMAC (12/01/2008)), which regulates well spacing in Eddy County. Chisos contends that this is important because of language in the JOA stating that

> [n]otwithstanding the provisions of this Section VI.A.2, it is agreed that without the mutual consent of the parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless the well conforms to the then existing well spacing pattern for such source of supply.

But this language appears in Section VI.A.2 of the JOA, which describes the procedures for non-consent operations. Because the breach issue depends on Section VI.A.1, not Section VI.A.2, this finding does not affect the outcome in any way. Accordingly, we decline to disturb this finding. *See In re Estate of Heeter*, 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct. App. 1992) ("On appeal, error will not be corrected if it will not change the result.").

## D.     Bad Faith and Retroactive Election

**{26}** In its final argument, Chisos contends that the district court erred in finding that it acted in bad faith and that, as a consequence, the district court erred in ordering Chisos to provide JKM a retroactive opportunity to participate in the HL2 well. The district court found that Chisos' letter giving JKM forty-eight hours to consent to work on the HL2 well

and to contribute $170,000 related to that work was sent in bad faith. Chisos argues that this finding was "inexplicable." In the contracts context, bad faith exists when the "breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party." *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 213, 880 P.2d 300, 310 (1994). The issue of bad faith is a factual question that we review for substantial evidence. *McKay v. Farmers & Stockmens Bank of Clayton*, 92 N.M. 181, 183, 585 P.2d 325, 327 (Ct. App. 1978). Certainly, a finding of bad faith that was "inexplicable" would not be supported by substantial evidence.

**{27}** Nevertheless, the record does provide an explanation. Even before it learned of the dispute, Chisos intended to work on the HL2 well. It stopped work for several months when it learned of the possibility that it might have no ownership interest in the well. However, in March 2007 it proceeded, disregarding this possibility. It procured the limited term assignment from Pure in order to continue with the rework. For two months, it did not give JKM the thirty-day notice required by the JOA. However, during that time it did arrange for a workover rig to be sent to the well. Once the rig was in place, it attempted to pass the workover rig off as a "drilling/workover" rig that would trigger the forty-eight-hour notice provision in the JOA applicable to drilling rigs. Chisos knew that the rig was not a drilling rig. Chisos also knew that JKM asserted ownership of the HL2 well. And, despite the fact that the rig was on site earlier in the week, Chisos sent the letter late on a Friday. These facts are substantial evidence supporting a finding of bad faith.

**{28}** By upholding the bad faith finding, we dispose of Chisos' argument that the order for a retroactive election was improper. Upholding the bad faith finding also disposes of Chisos' argument that JKM was not entitled to an equitable remedy. *See Romero v. Bank of the Sw.*, 2003-NMCA-124, ¶¶ 37-38, 135 N.M. 1, 83 P.3d 288. Chisos also cites to no authority in support of this argument, which appears only in the heading and in the last sentence of the section. We need not and do not address arguments that are not supported by authority. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969.

## III.   CONCLUSION

**{29}** For the foregoing reasons, we affirm the district court's decision.

**{30}   IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____

8

**MICHAEL E. VIGIL, Judge**


**Topic Index for *Chisos, Ltd. v. JKM Energy, LLC*, Docket No. 29,265**

| | |
|---|---|
| **CN** | **CONTRACTS** |
| CN-AM | Ambiguous Contracts |
| CN-GF | Covenant of Good Faith and Fair Dealing |
| CN-IN | Interpretation |
| | |
| **NR** | **NATURAL RESOURCES** |
| NR-OG | Oil and Gas |
| | |
| **PR** | **PROPERTY** |
| PR-CY | Conveyances |
| PR-PH | Purchase Agreement |

## CONVEYANCE AND BILL OF SALE

This Conveyance and Bill of Sale is by and between Chisos, Ltd., a Texas corporation, whose address is 670 Dona Ana Road, SW, Deming, New Mexico 88030, hereinafter referred to as "Assignor" and JKM Energy, LLC, a New Mexico limited liability company, whose address is 26 East Compress Road, Artesia, New Mexico 88210, hereinafter referred to as "Assignee".

WHEREAS, Assignor is the owner of record of 100.00% of the operating rights in State Oil and Gas Lease – Stetson "2" State Com No. 1 Well, API Number 30-015-31012, located 990 feet from the South line and 990 feet from the West line, Section 2, Township 19 South, Range 29 East, NMPM, Eddy County, New Mexico (the " Well"); and

WHEREAS, it is the desire of the parties hereto to place Assignee as owner of record of the Well.

## WITNESSETH:

Assignor, for valuable consideration paid to Assignor by Assignee, the receipt and sufficiency of which are hereby acknowledged, does hereby grant, bargain, sell, convey and assign, set over and deliver, effective September 1, 2005 ("Effective Date"), unto Assignee and Assignee's successors and assigns, the undivided interest of Assignor described above in and to the following:

a. 100% of the operating rights and 75% of the net revenue interest in and to the Well and spaced unit, INSOFAR AS AND ONLY INSOFAR AS said lease covers the West Half (W/2) of Section 2, Township 19 South, Range 29 East, NMPM. Eddy County, New Mexico; subject, however, to the reservation by Assignor, described below, and the restrictions, exceptions, reservations, conditions, limitations, existing royalties, overriding royalties, production payment interests, burdens on production and other matters, if any, heretofore created and validly shown of record;

b. All of Assignor's, title and interest in, to and under or derived from:

    i)    All of the presently existing and valid unitization agreements and unit operating agreements;

    ii)    All of the presently existing and valid oil, casinghead gas and gas sales purchase agreements; and

    iii)    All other contracts, agreements and instruments which relate to the property and interests specifically described above (or properties unitized therewith).

c. All personal property, improvements, easements, permits, licenses, servitudes and rights-of-ways situated upon or used in connection with the exploration, development or operations of the interest described above or the production,

treating, storing or transportation of oil, gas and other hydrocarbon substances, including but not by way of limitation, wells, casing, tubing, derricks, pumps, flow lines, gas lines, water lines, salt water disposal facilities, tanks, separators, building, machinery, equipment, road and other appurtenances situated on the interest described above or lands unitized therewith or which are used in connection with hydrocarbon operations on the interests described in paragraph a), b) and c) above or land unitized therewith.

Assignor shall and does hereby reserve and retain unto itself an overriding royalty interest equal to the difference between the lease burdens (including the lessor's royalty and any overriding royalties in existence as of the effective date), and twenty-five percent of eight-eighths (25% of 8/8ths) in and to all of the oil and gas saved and sold from or attributable to the Well.

Such overriding royalty interest shall be generally calculated, determined and paid in the same manner as the lessor's royalty under the terms of the applicable lease; provided however, Assignor's reserved overriding royalty shall be free and clear of all exploring, producing and developing costs. Assignor's overriding royalty shall bear its proportionate part of all severance or other similar taxes (except gathering taxes) which are applicable to such production.

THE INTERESTS ARE CONVEYED AND ASSIGNED WITHOUT REPRESENTATION, CONVENANT OR WARRANTY OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY AND THAT ALL INTERESTS, PERSONAL PROPERTY AND EQUIPMENT CONVEYED HEREBY ARE SOLD AND ASSIGNED AND ACCEPTED BY ASSIGNEE IN THE "WHERE IS, AS IS" CONDITION WITOUT ANY WARRANTIES WHATSOVER, EITHER EXPRESS , IMPLIED OR STATUTORY OF MARKETABILITY. QUALITY, CONDITION, MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PUPOSE OR USE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. IN ADDITION, ASSIGNOR MAKES NO REPRESENTATION, COVENANT OR WARRANTY, EITHER EXPRESS, IMPLIED OR STTUTORY, CONCERNING THE QUALITY OR QUANTITY OF HYDROCARBON RESERVES ATRRIBUTABLE TO THE INTERESTS OR THE ABILITY OF THE INTEREST TO PODUCE HYDROCARBONS OR THE PRICES WHICH ASSIGNEE IS OR WILL BE ENTITLED TO RECEIVE FOR ANY SUCH HYDROCARBONS.

Assignee agrees, by accepting this assignment, to assume the responsibility for the well bore of the Well and the risk, cost and expense or future operations including plugging and abandoning of the well bore of the Well. Assignee agrees to indemnify and hold harmless Assignor, its, agents, employees and assign, from all liability, claims, demands or causes of action arising out of Assignee's operations in or use of the assigned Well, including without imitation the proper plugging and abandonment of the well bore of the Well.

11

Assignor agrees to execute and deliver all such other instruments, notices, division or transfer orders, releases, acquaintances and documents as may be necessary to more fully assure Assignee, its successors and assigns, all of the respective rights, titles, interests, estates, remedies, powers and privileges herein and hereby granted, bargained sold, conveyed, assigned and delivered.

Assignee shall observe and comply with all convents, terms and provisions, express or implied, contained in the agreements, lease, easements and all other contracts pertaining to Assignor's interest in the assets which appear of record in the records of Eddy County, New Mexico as of the Effective Date of this transfer or are found in the files of Assignor, or have otherwise been provided by Assignee.

Assignor makes no warranties of title, either express or implied.

IN WITNESS WHEREOF, Assignor has caused this conveyance to be duly executed on this 12th day of September 2005.

ASSIGNOR:
CHISOS, LTD.

By:    Sue Ann Craddock, Attorney-in-Fact

ASSIGNEE:
JKM ENERGY, LLC

By:    Jack Matthews, Managing Member

12

## ACKNOWLEDGEMENTS

STATE OF NEW MEXICO       §

COUNTY OF LUNA       §

On this 12TH day of September 2005, before me appeared Sue Ann Craddock, to me personally known, who, being by me duly sworn, did say that she is the Attorney-in-Fact for Chisos, Ltd., a Texas limited partnership and that the foregoing instrument was signed on behalf of the partnership and that she acknowledged the instrument to be the free act and deed of the partnership.

WITNESS my hand and official seal this 12th day of September 2005.



My Com~~~~ Exp~~~~ **Lane G. Costilow**
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: June 1, 2009

Notary Public in and for the
County of Luna,
State of New Mexico

STATE OF NEW MEXICO       §

COUNTY OF       §

On this 22 day of September 2005, before me appeared Jack Matthews, to me personally known, who, being by me duly sworn, did say that he is the Managing Member for JKM Energy, LLC, a New Mexico limited liability company and that the foregoing instrument was signed on behalf of the limited liability company and that he acknowledged the instrument to be the free act and deed of the limited liability company.

WITNESS my hand and official seal this 22 day of September 2005.

My Commission Expires:
OFFICIAL SEAL
Julie Deason
NOTARY PUBLIC-STATE OF NEW MEXICO
My commission expires: 9·8·2007

Notary Public in and for the
County of Eddy
State of New Mexico

Jack Mathews
26 E. Compress Rd

RECEPTION NO: 0511813   STATE OF
NEW MEXICO, COUNTY OF EDDY
RECORDED 09/30/2005 9:52 AM
BOOK 0613 PAGE 0682 C. Ruiz
~~~~ ~~~~~~ COUNTY CLERK

13